

Opinions of the United
States Court of Appeals
for the Third Circuit

9-16-1994

# Instructional Syst. Inc. v. Computer Curric. Corp.

Precedential or Non-Precedential:

Docket 93-5490

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Instructional Syst. Inc. v. Computer Curric. Corp." (1994). *1994 Decisions*. Paper 135.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/135

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 93-5414


INSTRUCTIONAL SYSTEMS, INC.,
a Corporation of the State of New Jersey

v.

COMPUTER CURRICULUM CORPORATION,
a Corporation of the State of Delaware

INSTRUCTIONAL SYSTEMS, INC.,
                                    Appellant


DEBORAH T. PORITZ,[*]
Attorney General of New Jersey,
                        Intervenor
                        (per the Court's
                        Nov. 19, 1993 order)


No. 93-5490


INSTRUCTIONAL SYSTEMS, INC.,
a Corporation of the State of New Jersey

v.

COMPUTER CURRICULUM CORPORATION,
a Corporation of the State of Delaware

v.

HON. ALFRED J. LECHNER, JR.,
United States District Judge
for the District of New Jersey,
                        Nominal Respondent

DEBORAH T. PORITZ,[*]
Attorney General of New Jersey,

---

[*]. Caption amended pursuant to Fed. R. App. P. 43(c).

Petitioner

No. 93-5635


INSTRUCTIONAL SYSTEMS, INC.,
a Corporation of the State of New Jersey,
<u>Petitioner</u>

v.

COMPUTER CURRICULUM CORPORATION,
a Corporation of the State of Delaware

HON. ALFRED J. LECHNER, JR.,
United States District Judge
for the District of New Jersey,
<u>Nominal Respondent</u>



No. 93-5722


INSTRUCTIONAL SYSTEMS, INC.,
a Corporation of the State of New Jersey

v.

COMPUTER CURRICULUM CORPORATION,
a Corporation of the State of Delaware

INSTRUCTIONAL SYSTEMS, INC.,
<u>Appellant</u>



No. 94-5048


INSTRUCTIONAL SYSTEMS, INC.,
a Corporation of the State of New Jersey

v.

COMPUTER CURRICULUM CORPORATION,
a Corporation of the State of Delaware

DEBORAH T. PORITZ,
Attorney General of New Jersey,

Intervenor in D.C., Appellant


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 89-00502)

Argued July 11, 1994

Before: SLOVITER, Chief Judge,
ROTH, Circuit Judge, and POLLAK,[*] District Judge

(Filed September 16, 1994)


Nicholas deB. Katzenbach  (Argued)
Douglas S. Eakeley
Sigrid S. Franzblau
Anne M. Patterson
Jeffrey J. Miller
Debra H. Azarian
Riker, Danzig, Scherer, Hyland
  & Perretti
Morristown, N.J.  07962-1981

John J. Gibbons
Crummy, Del Deo, Dolan,
  Griffinger & Vecchione
Newark, N.J. 07102-5497

Warren S. Robins
Robert E. Rochford
Dunn, Pashman, Sponzilli, Swick
  & Finnerty
Hackensack, N.J.  07601

        Counsel for Appellant/Petitioner Instructional
        Systems, Inc.

---

[*]. Hon. Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

Sidney S. Rosdeitcher  (Argued)
Paul, Weiss, Rifkind, Wharton & Garrison
New York, N.Y.  10019-6064

A. Leon Higginbotham, Jr.
Jay Greenfield
Gary Stein
Marcella David
  Of Counsel

Andrew T. Berry
McCarter & English
Newark, N.J.  07101-0652

          Counsel for Appellee/Respondent Computer
          Curriculum Corp.

Bertram P. Goltz, Jr.  (Argued)
  Deputy Attorney General
Joseph L. Yannotti, Jr.
  Assistant Attorney General
Office of Attorney General of N.J.
Newark, N.J.  07101

          Counsel for Intervenor/Petitioner Attorney
          General of New Jersey

OPINION OF THE COURT


SLOVITER, Chief Judge.

In a far-reaching opinion, the district court limited the application of the New Jersey Franchise Practices Act to the activities of a New Jersey franchisee within New Jersey on the ground that giving the Act extraterritorial effect would conflict with the dormant Commerce Clause.  Before we reach this issue of first impression, we must wind through the present status of the law on Pullman abstention and an England reservation.

I.

**FACTS AND PROCEDURAL HISTORY**

The relevant facts are not disputed. Computer Curriculum Corporation (CCC), a Delaware corporation headquartered in Palo Alto, California, produces and markets an integrated learning system that uses computer technology to teach and monitor a student's progress. Since 1975, Instructional Systems, Inc. (ISI), a New Jersey corporation,[1] was CCC's exclusive distributor in the northeastern United States, subject to limited reservations by CCC. The parties entered into an agreement in 1984 that provided that ISI would be CCC's exclusive reseller in Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, Rhode Island, Vermont and Washington D.C., and that for its part ISI would sell only in those states and would deal only in CCC products. The Agreement provided that it would continue in effect until July 31, 1989. Finally, the Agreement provided that it "shall be construed and interpreted, and the legal relations created by it shall be determined, in accordance with the laws of the State of California." Jt. App. at 934.

As 1989 approached, CCC decided not to extend its relationship with ISI for the entire territory covered by the

_____

[1]. Originally, CCC's arrangement was with ISI's predecessor, Educomp of New Jersey. The principal of both corporations was the same, Phyllis Kaminer.

1984 Agreement because, it claims, ISI was not aggressively marketing in some of the states.  Instead, it offered ISI a two-year contract which limited ISI's market territory to New Jersey, New York and Massachusetts, thereby allowing CCC to distribute its products directly in the other (former ISI) states.  ISI executed the 1989 Agreement under protest on January 30, 1989, and simultaneously filed its complaint in the Superior Court of New Jersey, Chancery Division.

The complaint contained seven counts.  Count One alleged that the 1984 Agreement constituted a "franchise" for purposes of the New Jersey Franchise Practices Act ("NJFPA" or "Act"), N.J. Stat. Ann. § 56:10-3,[2] 10-4,[3] and that CCC violated the NJFPA by (a) failing to renew without good cause in violation

---

[2].  Section 10-3(a) of the NJFPA defines a "franchise" as a:

> written arrangement for a definite or indefinite period, in which a person grants to another person a <u>license</u> to use a trade name, trade mark, service mark, or related characteristics, and in which there is a <u>community of interest</u> in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J. Stat. Ann. § 56:10-3(a) (West 1989) (emphasis added).

[3].  Section 10-4 limits the scope of the NJFPA by providing that "[t]his act applies only to a franchise . . . the performance of which contemplates or requires the franchisee to establish or maintain a <u>place of business</u> within the State of New Jersey." N.J. Stat. Ann. § 56:10-4 (West 1989 & Supp. 1994) (emphasis added).  The NJFPA defines a "place of business" as a "fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services.  Place of business shall not mean an office, a warehouse, a place of storage, a residence or a vehicle."  <u>Id.</u> § 56:10-3(f).

of Section 10-5,[4] and (b) attempting to impose unreasonable standards of performance upon ISI in the formation of the 1989 Agreement in violation of Section 10-7.[5] Counts Two through Seven alleged a variety of state common law claims.[6] As a remedy for each count, ISI sought an injunction restraining CCC from terminating its relationship with ISI and damages.

CCC removed the case to federal court on the basis of diversity of citizenship. In June 1989, following discovery, ISI moved for a preliminary injunction and partial summary judgment on the issue of whether the 1984 Agreement constituted a franchise agreement under the NJFPA. CCC opposed ISI's motions and filed a cross-motion for partial summary judgment, arguing that (1) California, not New Jersey, law applied to the 1984

---

[4]. Section 10-5 of the NJFPA, which sets forth the requirements for the termination of a franchise, provides in part:

> It shall be a violation of this act for any franchisor to terminate, cancel or <u>fail to renew a franchise without good cause</u>. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.

N.J. Stat. Ann. § 56:10-5 (West 1989) (emphasis added).

[5]. Section 10-7 of the NJFPA prohibits franchisors from "impos[ing] unreasonable standards of performance upon a franchisee." N.J. Stat. Ann. § 56:10-7(e) (West 1989).

[6]. Specifically, Count Two alleged a breach of contract; Count Three, a breach of the implied covenant of good faith and fair dealing; Count Four, tortious interference with prospective economic advantage; Count Five, a breach of a covenant of non-competition; Count Six, unjust enrichment; and Count Seven, a breach of fiduciary duty.

Agreement; (2) application of the NJFPA to the franchise territory outside New Jersey would violate the dormant Commerce Clause; (3) the 1984 Agreement was not a franchise as defined by the NJFPA; and (4) CCC's actions were not in violation of the NJFPA.  ISI responded by petitioning the district court to abstain pursuant to Railroad Commission v. Pullman, 312 U.S. 496 (1941), so that the NJFPA claim could be considered by the New Jersey courts.

The district court granted ISI's request for abstention over CCC's objection that the case could be resolved without reaching the constitutional questions raised by its motion for partial summary judgment.  The court reasoned that "[i]f the New Jersey courts determine ISI does not fit within the definitional requirements of a franchise or that the Franchise Practices Acts is inapplicable to States other than New Jersey, then the need to address the commerce clause question in this matter will be eliminated."  Jt. App. at 577.

ISI filed a suit for declaratory judgment in the New Jersey Superior Court, Chancery Division on July 27, 1989.  After additional discovery, both parties moved for summary judgment. The court entered a declaratory judgment in favor of ISI, holding (1) that New Jersey law applied to the 1984 Agreement despite the choice-of-law provision of the Agreement; (2) that the 1984 Agreement was a "franchise" for purposes of the NJFPA, and (3) that the NJFPA applied even though the agreement encompassed a multistate territory.  See Instructional Sys., Inc. v. Computer Curriculum Corp., No. C-4116-89E (N.J. Super. Ct. Ch. Div. Oct.

30, 1989) (ISI I).  The Appellate Division of the Superior Court reversed, see Instructional Sys., Inc. v. Computer Curriculum Corp., 578 A.2d 876 (N.J. Super. Ct. App. Div. 1990) (ISI II), but the New Jersey Supreme Court reversed the Appellate Division and reinstated the judgment of the Chancery Division in October 1992, see Instructional Sys., Inc. v. Computer Curriculum Corp., 614 A.2d 124 (N.J. 1992) (ISI III).

The Supreme Court analyzed the issues before it in a series of questions.  First, it decided what a franchise was under the NJFPA.  Then it proceeded with the threshold choice-of-law question, holding that although "a close question," the trial court had not erred in applying New Jersey law because New Jersey has a strong policy in favor of protecting its franchisees and because the franchisee is located in New Jersey, the majority of its employees reside in New Jersey, the investments relate primarily to assets in New Jersey, and the goodwill was developed for CCC by New Jersey residents.  Id. at 135.

The Court then proceeded to determine whether the evidence was sufficient to find the statutory requirements for the existence of a franchise, which depended on whether ISI had a "place of business" in New Jersey, a "license," and a "community of interest" with CCC.  Finding that these were all satisfied, see id. at 136-46, the Court then turned to the question whether the Act has "extraterritorial reach to the franchise activities in states other than New Jersey."  Id. at 146.  The Court reasoned that at its core, the NJFPA "is meant to deal with the unconscionable business practices affecting New Jersey

franchises," id. at 147, but that in meeting that purpose, the application of the Act did not stop at New Jersey's border. In its consideration of this issue, the Court discussed whether the application of New Jersey law in this manner would be consistent with the Commerce Clause. It reasoned that "New Jersey has no power, and therefore no interest, to regulate commerce that occurs entirely beyond its borders," but that this statute was regulating only "in-state conduct that has out-of-state effects." Id. at 146. The Court thus saw no unconstitutionality under the Commerce Clause or Due Process Clause "despite some incidental extraterritorial effects." Id. at 148.

The case then returned to the district court. CCC moved for partial summary judgment as to that portion of Count One that was based on application of the NJFPA outside of New Jersey. The district court gave notice of the attack on the constitutionality of the NJFPA to the Attorney General of New Jersey, see 28 U.S.C. § 2403(b) (1988), who chose to participate but did not formally intervene. On June 2, 1993, the district court granted CCC's motion for partial summary judgment as to the portion of Count One that sought to enjoin CCC from terminating ISI's franchise in states other than New Jersey. The district court's ruling was based on its determination that application of the NJFPA outside New Jersey was a per se violation of the Commerce Clause. See Instructional Sys., Inc. v. Computer

<u>Curriculum Corp.</u>, 826 F. Supp. 831, 848 (D.N.J. 1993) (<u>ISI IV</u>). ISI and the Attorney General appealed.[7]

CCC then moved for summary judgment on the six remaining common law claims as well as the remainder of Count One. The district court granted partial summary judgment on the common law claims on November 9, 1993, leaving for trial only

---

[7]. On June 16, ISI petitioned the district court for certification of an interlocutory appeal under 28 U.S.C. § 1292(b), and the Attorney General asked for a certification under either Federal Rule of Civil Procedure 54(b) or § 1292(b) on June 18. ISI also filed a notice of appeal (docketed in this court as No. 93-5414) on July 2, arguing that this court had jurisdiction because the district court had denied its motion for an injunction. On July 22, the district court denied the parties' requests under § 1292(b) and Rule 54(b), reasoning that ISI's notice of appeal deprived it of jurisdiction to certify the order under either of the sections.

The Attorney General filed a petition for mandamus on August 12 (No. 93-5490) asking this court to order the district court to consider the certification requests, and a motions panel of this court remanded the case to the district court on September 20 "so that it may consider whether to grant motions for certification under 28 U.S.C. § 1292(b) or Fed. R. Civ. P. 54(b) free of its concern as to jurisdictional restraint by reason of the interlocutory appeal." Jt. App. at 1301. After the district court denied the motions on the merits on October 5, ISI filed a petition for mandamus on October 25 to vacate the June 2 district court order (No. 93-5635) and the Attorney General filed a supplemental petition for mandamus on November 10 seeking the same.

that portion of Count One that which alleged that CCC has imposed unreasonable terms and conditions on ISI in the 1989 Agreement as regards to New Jersey. See Instructional Sys., Inc. v. Computer Curriculum Corp., No. 89-502(AJL) (D.N.J. Nov. 9, 1993) (ISI V). ISI appealed.[8]

On appeal, this court granted the Attorney General's motion to intervene in No. 93-5414, and consolidated the five related appeals and petitions for disposition. We have jurisdiction over the appeals docketed at Nos. 93-5414, 93-5722 and 94-5048 pursuant to 28 U.S.C. § 1291 (1988).[9] Because the questions on appeal are legal, we exercise plenary review.

---

[8]. ISI filed a notice of appeal on November 24, 1993 (No. 93-5722), claiming jurisdiction under 28 U.S.C. § 1292(a)(1). In mid-December CCC moved to certify the summary judgment orders as final under Rule 54(b). After ISI withdrew its opposition, the district judge to whom the case had been reassigned certified the summary judgment orders of June 2 and November 9 under Rule 54(b) on December 27. The Attorney General then filed a timely appeal from this order on January 25, 1994 (No. 94-5048). The remaining claim under the NJFPA, that the 1989 Agreement imposed unreasonable conditions of performance, was stayed pending the appeal.

[9]. While there is some question whether we would have had jurisdiction over the appeals docketed at Nos. 93-5414 and 93-5722 because the action was still pending below and the orders may not have met the requirements laid out in Carson v. American Brands, Inc., 450 U.S. 79, 83-84 (1981), the district court's certification of these orders as appealable under Rule 54(b) resolves this issue. We have held that even after a notice of appeal has been filed, a proper Rule 54(b) certification will cure any jurisdictional defect of a premature appeal. See Feather v. United Mine Workers of America, 711 F.2d 530, 535 (3d Cir. 1983). Since we have jurisdiction over all the district court's relevant orders to date, we will deny the petitions for mandamus in Nos. 93-5490 and 93-5635. See Helstoski v. Meanor, 442 U.S. 500, 506 (1979) (mandamus inappropriate when direct appeal immediately available).

II.

**DISCUSSION**

A.

Abstention, Reservation and Preclusion

ISI contends that we are bound to accept not only the New Jersey Supreme Court's decision on the scope of the NJFPA and its application to its arrangement with CCC but also that Court's conclusion that such an application did not violate the dormant Commerce Clause, as CCC had argued.  CCC would limit not only the effect of the New Jersey courts' interpretation of the federal constitutional issue, but also their interpretation of the state law issues.  These contentions require that we examine the circumstances surrounding the district court's Pullman abstention.

In deciding to abstain, the court stated that it was "remitt[ing]" to the state courts: "(a) Whether the Act has extraterritorial reach beyond the State of New Jersey . . . ; and (b) What are the definitions and standards of 'community of interest,' 'license' and 'place of business' under the Act?"  Jt. App. at 587.  It reserved to itself the "[a]pplication of the principles of law determined by the state court to the facts of this case"; "[a]ny constitutional challenge to the Act"; and "[a]ny application for injunctive or other interim relief."  Jt. App. at 588.  On ISI's request for clarification, the court explained that it expected the parties to file a declaratory judgment action.  It recognized that to avoid giving an advisory opinion, the state court would have to look at the facts of this

case in order to render its decision on the state law issues, but reiterated that it was maintaining fact-finding jurisdiction over the constitutional question.

Neither party presently challenges the propriety of abstaining per se.[10] However, the parties vigorously dispute the scope and effect of the district court's abstention.

1.

Pullman Abstention

It is a general rule that "federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred." New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 358 (1989). There are a small number of "exceptional circumstances" which justify deviation from this rule. See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 14 (1983). "Abstention . . . is the exception and not the rule. The federal courts' obligation to adjudicate claims within their jurisdiction is virtually unflagging." Marks v. Stinson, 19 F.3d 873, 881 (3d Cir. 1994) (quotations and citation omitted).

The abstention doctrine that stems from Railroad Commission v. Pullman, 312 U.S. 496 (1941), provides that "when a

---

[10]. No party took an appeal from the order abstaining and staying the federal proceedings. See Hovsons Inc. v. Secretary of the Interior of the U.S., 711 F.2d 1208, 1211 (3d Cir. 1983) (the Court of Appeals has jurisdiction over appeal from district court's order to stay federal proceedings on Pullman grounds).

federal court is presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question, abstention may be justified under principles of comity in order to avoid needless friction with state policies."  Marks, 19 F.3d at 882 n.6 (quotation and citation omitted); see also Chez Sez III Corp. v. Township of Union, 945 F.2d 628, 631 (3d Cir. 1991) (describing three-step analysis of Pullman abstention), cert. denied, 112 S. Ct. 1265 (1992).

Pullman abstention is "virtually prohibited in diversity cases where the only difficulty is the unsettled posture of state law."  Urbano v. Board of Managers of N.J. State Prison, 415 F.2d 247, 253 (3d Cir. 1969), cert. denied, 397 U.S. 948 (1970); see also McNeese v. Board of Educ., 373 U.S. 668, 673 n.5 (1963); Meredith v. Winter Haven, 320 U.S. 228, 236 (1943). However, there are some situations for abstention even when the suit is brought under diversity jurisdiction.  In Clay v. Sun Insurance Office Ltd., 363 U.S. 207, 212 (1960), the Court held that abstention was appropriate in a diversity suit when the defendant had raised doubts about the constitutionality of the statute relied upon by the plaintiff and the court "could not, on the available materials, make a confident guess how the [state] Supreme Court would construe the statute."  Under these conditions, the Court found that abstention was justified "where a federal constitutional question might be mooted [by securing] . . . an authoritative state court's determination of an unresolved question of its local law."  Id.

This court has also recognized such a situation under precisely the same statute at issue here.  In <u>Consumers Oil Corp. v. Phillips Petroleum Co.</u>, 488 F.2d 816, 819 (3d Cir. 1973), we held that abstention was appropriate in a diversity suit claiming a violation of the NJFPA because state law was unclear as to whether the Act applied to the agreement at issue and, if it did, "substantial constitutional questions" would need to be faced. <u>But see</u> <u>Mariniello v. Shell Oil Co.</u>, 511 F.2d 853, 860-61 (3d Cir. 1975) (abstention inappropriate in adjudicating constitutional objections to New Jersey common law analog to the NJFPA).

2.

England Reservation

A party displaced from federal court under Pullman does not lose its right to a federal forum for all its claims. In England v. Louisiana State Board of Medical Examiners, 375 U.S. 411 (1964), the Supreme Court was presented with a case in which the plaintiffs sued in federal court, were sent to the state courts under Pullman abstention, litigated all their claims there, lost, and then returned to federal court in an attempt to litigate their federal claims anew. Plaintiffs argued that they felt compelled to litigate their federal claims in state court by the Court's decision in Government & Civic Employees Organizing Committee, CIO v. Windsor, 353 U.S. 364, 366 (1957), which required parties remitted to the state courts under Pullman to inform those courts what their federal claims were so that the state courts had the opportunity to construe the statute "in light of" those claims.

In England, the Court sought to balance the parties' rights to a federal forum with the federalism concerns inherent in rendering a constitutional judgment on an unclear state statute. It held that a party may preserve its right to return to federal court by making an express reservation in the state court that "he is exposing his federal claims there only for the purpose of complying with Windsor, and that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." 375 U.S. at 421. Such a reservation of federal

claims may be made by any party to the litigation.  See id. at 422 n.13.

In this case it is clear that the federal question of whether the NJFPA could be constitutionally applied to the 1984 Agreement was explicitly reserved by CCC throughout the course of the state proceedings.  Indeed, when the case was reactivated in the district court, it was ISI which submitted a letter to the district court that "concluded that the record supports CCC's contention that it entered a proper England reservation."  Jt. App. at 1746.[11]

Although ISI now seeks to recant its conclusion,[12] it is clear from the record that CCC properly preserved its England reservation.  At every stage of the state court proceedings, one

---

[11].  While noting several times when CCC had discussed the issue, ISI stated that "[t]he record can be interpreted to indicate that CCC presented the constitutional issue to the state courts in order to inform those court of its existence, as required by Windsor and England.  We have therefore concluded that CCC reserved its right to a determination by this Court of the federal constitutional issue."  Jt. App. at 1747.

[12].  ISI claims for the first time in its brief in No. 93-5722 that its concession was "mistaken," and suggests that despite its waiver of the issue, because there was no valid reservation the district court lacks subject matter jurisdiction over the claim under the Rooker-Feldman doctrine.  See Port Auth. Police Benevolent Ass'n v. Port Auth., 973 F.2d 169, 177 (3d Cir. 1992) (Rooker-Feldman doctrine provides that "lower federal courts lack subject matter jurisdiction to engage in appellate review of state court determinations or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'" (citation omitted)).  It concedes that Rooker-Feldman does not apply if we find the England reservation to be properly preserved.  See Ivy Club v. Edwards, 943 F.2d 270, 284 (3d Cir. 1991), cert. denied, 112 S. Ct. 1282 (1992).  Because we do so find, we need not consider the effect of ISI's waiver.

party, if not both, stated that any constitutional questions were reserved for the district court and were being raised only to comply with the Supreme Court's Windsor decision.[13]  We therefore reject ISI's claim that the fact that the New Jersey Supreme Court discussed the Commerce Clause issue in rendering its

---

[13]. In the Chancery Division of the Superior Court, CCC expressly reserved its federal claims both at a hearing, Jt. App. at 1583-84, and in its brief, Supp. App. at 833-34.  At the Appellate Division of the Superior Court, CCC noted that the district court had reserved jurisdiction to rule on any constitutional claims.  Supp. App. at 1094.  Its reference to the Commerce Clause was in the context of disputing the Chancery Division's statutory construction and arguing that interpreting the statute as the Chancery Division did would violate the Commerce Clause.  Supp. App. at 1107-09.

The parties took the same position before the New Jersey Supreme Court.  There was no dispute, as ISI noted in its submissions to the Supreme Court, that "the federal constitutional issue arising under the Commerce Clause . . . is reserved for the federal court." Supp. App. at 1455; see also Supp. App. at 1461 n.2, 1492-93.  CCC also made that point clear. Supp. App. at 1481.

Although CCC did mention the Commerce Clause issue in its merits brief, Supp. App. at 1543-44, it did so once again in the context of arguing that the Court should not construe the NJFPA to apply extraterritorially because that construction would impermissibly burden interstate commerce.  At the original oral argument and on rehearing, CCC and ISI both noted at various times that the Commerce Clause question was reserved for the district court. Supp. App. at 1662, 1666, 1837, and a member of the Court noted during the argument that "[t]he Commerce Clause issue is reserved."  Supp. Ap. at 1807.

In post-argument briefs, ISI suggested for the first time that CCC violated the England command not to "affirmatively argue" the constitutional issue because CCC had discussed the Commerce Clause issue in its brief and at oral argument.  Supp. App. at 1740-41.  CCC responded that "CCC has merely informed the Court, for its assistance in construing the New Jersey statute, of the serious constitutional problem presented by ISI's construction."  Supp. App. at 1772.

decision about whether the Act applied extraterritorially, see ISI III, 614 A.2d at 146-48, precludes the federal courts' consideration of the issue, which was properly preserved.[14] As the Supreme Court noted in England, "the parties cannot prevent the state court from rendering a decision on the federal question if it chooses to do so." 375 U.S. at 421; see also 17A Charles A. Wright et al., Federal Practice and Procedure § 4243 (1988). It is the actions of the displaced litigant which are controlling and thus, after reviewing the parties' actions, we agree with the Attorney General that "the Commerce Clause issue did remain pending before the District Court, and the District Court was obligated to adjudicate it." Attorney General's Br. at 25.

ISI insists that even if CCC made a proper England reservation, we are bound by the factual findings and legal conclusions of the New Jersey courts by the full faith and credit statute, 28 U.S.C. § 1738 (1988), which requires that federal courts give "full faith and credit" to "judicial proceedings of

---

[14]. Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518 (1986), which ISI cites, is inapposite. In Parsons, the parties had concurrent actions pending in state and federal court regarding events arising out of the same conduct, the defendants first won in federal court, but the state court rejected the defenses of res judicata and collateral estoppel, and the defendants were found liable in that forum. The federal court then enjoined enforcement of the state court judgment because it determined that the state action was barred by res judicata. The Supreme Court held that the district court erred in failing to apply state preclusion law and remanded for a determination of whether the state court's resolution of the res judicata issue would be given preclusive effect in another court of the same state. It did not hold, as ISI implicitly suggests, that a state court's consideration of an issue precludes a federal court from doing so.

any court of any State." It is true that a federal court is normally bound to extend preclusive effect to state proceedings to the same extent that courts of that state would do so. See Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 84 (1984); Allen v. McCurry, 449 U.S. 90, 99 (1980); cf. Township of Washington v. Gould, 189 A.2d 697, 700 (N.J. 1963) (declaratory judgments given preclusive effect under New Jersey law).

However, the Supreme Court noted in both those cases that when a party sought to adjudicate his claims in a federal forum and then was involuntarily remitted to state court, the party "can preserve his right to a federal forum for his federal claims by informing the state court of his intention to return to federal court on his federal claims following litigation of his state claims in state court." Migra, 465 U.S. at 85 n.7 (citing England); see also Allen, 449 U.S. at 101–02 n.17 (distinguishing England reservations as having "no bearing on the present case"). As we noted in Kovats v. Rutgers, 749 F.2d 1041, 1046 (3d Cir. 1984), "in its major preclusion decisions the [Supreme] Court has sought to distinguish the England situation." Thus the traditional rules of res judicata and collateral estoppel as applied by section 1738 do not apply to state proceedings that follow Pullman abstention and an England reservation. See Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1072 (3d Cir. 1990) (claim preclusion does not apply to state court proceedings when proper England reservation made); see also Fields v. Sarasota Manatee Airport Auth., 953 F.2d 1299, 1302 n.1, 1306

(11th Cir. 1992) (Pullman/England situation is an exception to full faith and credit requirements).

CCC argues that notwithstanding the England reservation, the New Jersey decisions are binding only on discrete facts found, i.e. the existence of a "place of business," "community of interest," and "license," but not on the ultimate facts, such as whether the relationship was a franchise under New Jersey law.  It relies on the emphasis given in England to federal fact-finding.  See 375 U.S. at 416-17 ("How the facts are found will often dictate the decision of federal claims . . . [Therefore,] in cases where, but for the application of the abstention doctrine, the primary fact determination would have been by the District Court, a litigant may not be unwillingly deprived of that determination.").

We believe that the state law issues determined in the state court proceedings must be viewed as more than merely persuasive authority.  We held in Kovats that a "state court's resolution of the state law question that required Pullman abstention clearly must be given some preclusive effect; otherwise abstention would be a meaningless procedure."  749 F.2d at 1046.  The Supreme Court did not expect the state courts to issue abstract opinions of law, removed from the facts of the case, or resolve factual disputes only to have them treated as advisory opinions.  Instead, the Court anticipated that the state court decision might resolve the suit entirely.  See England, 375 U.S. at 421; see also Phillips v. Pennsylvania Higher Educ. Assistance Agency, 657 F.2d 554, 560 n.9 (3d Cir. 1981)

(suggesting that state court decision under Pullman could definitively resolve the suit, even if resolution of legal issue was fact-intensive), cert. denied, 455 U.S. 924 (1982). Implicit in that assumption is the acknowledgement that the state courts will be rendering judgments based on a factual record.

While some states have certification provisions which may permit obtaining a state court's views on state law with only a sketchy factual context, see John B. Corr & Ira P. Robbins, Interjurisdictional Certification and Choice of Law, 41 Vand. L. Rev. 411, 421-22 (1988), New Jersey is not such a state. In fact, New Jersey has expressed a strong policy against issuing advisory opinions. See New Jersey Ass'n for Retarded Citizens, Inc. v. New Jersey Dep't of Human Servs., 445 A.2d 704, 707 (N.J. 1982) ("We will not render advisory opinions or function in the abstract."); Civil Serv. Comm'n v. Senate of New Jersey, 397 A.2d 1098, 1101 (N.J. Super. Ct. App. Div.), certif. denied, 405 A.2d 811 (N.J. 1979); Biegenwald v. Fauver, 882 F.2d 748, 753 (3d Cir. 1989).

Thus, the judgment the parties have received from the New Jersey courts on the state law claims binds them, absent any federal impediment. This is so even in the rare Pullman abstention case such as this, where the state court must resolve factual disputes or engage in a totality-of-the-circumstances analysis in reaching its conclusions. In Ivy Club v. Edwards, 943 F.2d 270, 283 (3d Cir. 1991), cert. denied, 112 S. Ct. 1282 (1992), this court held that "[u]pon return to federal court [after Pullman/England], the federal plaintiff may fully litigate

his federal claims, including the factual issues that may be identical to those underlying the state law question."  However, in recognition of the nature of the state court proceedings as authoritative, we also held that "issue preclusion applies . . . to the state law question decided by the state court."  Id.

This modified application of the preclusion doctrine to the state law claims is consistent with the policies underlying not only the full faith and credit statute, but also the Rules of Decisions Act, 28 U.S.C. § 1652 (1988).  The Rules of Decision Act, as interpreted by the Supreme Court in Erie Railroad v. Tompkins, 304 U.S. 64 (1938), and its progeny, requires as a matter of federalism that a federal court sitting in diversity attempt to apply state law as if it were a state court.  In this case, for example, the district court needed to determine which state's law a New Jersey court would apply to the 1984 Agreement.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).  A New Jersey court, in fact the highest New Jersey court, has definitively answered that question.  As long as the parties had a full and fair opportunity to litigate the issue in the state proceeding, cf. Kremer v. Chemical Constr. Corp., 456 U.S. 461, 481-82 (1982), it would offend all notions of comity and common sense to permit relitigation of that issue.  Thus we hold that the New Jersey courts were entitled to resolve the state law issues presented in the context of the declaratory judgment suit (whether the parties' agreement was covered by the NJFPA), and we are bound to accept their answer (yes), as well as the factual and legal findings necessary to that answer.

B.

Commerce Clause

We thus turn to the district court's holding that, accepting the New Jersey Supreme Court's decision that the 1984 Agreement was governed by the NJFPA, that statute violates the dormant Commerce Clause when applied to activities of a New Jersey franchise outside New Jersey.[15]

The Commerce Clause provides that "Congress shall have Power . . . To regulate Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3.  The Supreme Court "long has recognized that this affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce."  Healy v. Beer Institute, 491 U.S. 324, 326 n.1 (1989).[16]  The Commerce Clause reflects "the Constitution's

---

[15].  CCC does not claim that New Jersey's choice-of-law holding itself violates the Commerce Clause and thus we do not reach that distinct question.  See Harold W. Horowitz, Comment, The Commerce Clause as a Limitation on State Choice-of-Law Doctrine, 81 Harv. L. Rev. 806, 813-24 (1971).

[16].  ISI seems to argue that if application of the NJFPA to the 1984 Agreement meets the requirements of due process, there can be no Commerce Clause problem.  It is clear, however, that the "[l]ocal regulations which would pass muster under the Due Process Clause might nonetheless fail to survive other challenges to constitutionality that bring the Supremacy Clause into play. Like any local law that conflicts with federal regulatory measures, state regulations that run afoul of the policy of free trade reflected in the Commerce Clause must also bow."  Bibb v. Navajo Freight Lines, 359 U.S. 520, 529 (1959) (citations omitted); see also Quill Corp. v. North Dakota, 112 S. Ct. 1904 (1992) (distinguishing application of due process and commerce clauses).

special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres."  Id. at 335-36.

The Supreme Court has articulated two tiers of scrutiny in analyzing statutes that regulate interstate commerce:

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry.  When, however, a statute only has indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579 (1986) (citations omitted).  In the end, the crucial consideration is "the overall effect of the statute on both local and interstate commerce."  Healy, 491 U.S. at 337 n.14.

1.

Per Se Violations

"The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce."  CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 87 (1987).  Such statutes are virtually per se invalid.  See C & A Carbone, Inc. v. Town of Clarkstown, 114 S. Ct. 1677, 1683 (1994); Philadelphia v. New Jersey, 437 U.S. 617, 627-28 (1978).  However, both parties agree that as the NJFPA does not

differentiate between in-state and out-of-state franchisors, there is no discrimination against interstate commerce. Instead, the district court treated the statute as a "direct" regulation of interstate commerce.

CCC argues, and the district court agreed, that imposing the NJFPA upon a multistate contract is per se invalid because it has the practical effect of regulating extraterritorially.[17] The Supreme Court has noted on more than one occasion that "the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," and that the "critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." Healy, 491 U.S. at 336 (quotation and citations omitted); see also Brown-Forman, 476 U.S. at 582 ("Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce."); Edgar v. MITE Corp., 457 U.S. 624, 643 (1982) ("[A]ny attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power." (quotation

---

[17]. At least one commentator has suggested that "extraterritoriality is not a dormant commerce clause problem" but acknowledges that the "[Supreme] Court has frequently treated extraterritorially, when it has arisen in the context of a dormant commerce clause case, as if it were a dormant commerce clause problem." Donald H. Regan, Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation, 85 Mich. L. Rev. 1865, 1873 (1987).

and citation omitted)); Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 521 (1935) ("New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there."); see also Old Bridge Chems., Inc. v. New Jersey Dep't of Envtl. Protection, 965 F.2d 1287, 1293 (3d Cir.) ("The Supreme Court has invalidated state statutes where a state has 'projected' its legislation into other states and directly regulated commerce therein, thereby either forcing individuals to abandon commerce in other states or forcing other states to alter their regulations to conform with the conflicting legislation."), cert. denied, 113 S. Ct. 602 (1992).

The fact that application of the NJFPA is triggered by in-state activity does not in itself insulate it from scrutiny under the dormant Commerce Clause, for not all in-state activity is sufficient to justify a law which regulates out-of-state transactions of an interstate actor. Compare Brown-Forman, 476 U.S. at 580 ("The mere fact that the effects of New York's ABC Law are triggered only by sales of liquor within the State of New York . . . does not validate the law if it regulates the out-of-state transactions of distillers who sell in-state.") and MITE, 457 U.S. at 641-42 (fact that corporation has some contacts with Illinois insufficient to permit Illinois to regulate its takeovers) with CTS, 481 U.S. at 93 (fact that corporation was incorporated in Indiana and has a substantial number of Indiana shareholders sufficient to permit Indiana to regulate its takeovers).

On the other hand, it is inevitable that a state's law, whether statutory or common law, will have extraterritorial effects. The Supreme Court has never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border. See Donald H. Regan, Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation, 85 Mich. L. Rev. 1865, 1878 (1987) ("prohibition [of all state laws that have substantial extraterritorial effects] would invalidate much too much legislation."). In traditional contract litigation, courts must apply some state's law to interpret the contract. While a contract which covers multiple states may raise a difficult choice-of-law question, once that question is resolved there is nothing untoward about applying one state's law to the entire contract, even if it requires applying that state's law to activities outside the state.

CCC does not dispute this, but attempts to distinguish the NJFPA, a "state regulation," from an ordinary state contract rule. We see no basis for any such dichotomy. The construction of a contract, including the interpretive policies embodied in common law and statutory enactments, is no more or less regulatory than the NJFPA, which imposes on franchises governed by New Jersey law certain provisions designed to promote fairness between the parties.

This is not to say that New Jersey would have a right to apply the NJFPA to any franchise agreement in the country, as long as suit is brought in New Jersey. But nothing in the text

of the NJFPA reaches that far.  Indeed, the New Jersey Supreme Court noted that "[b]y definition, the Act, and particularly its community-of-interest requirement, is intended to protect business parties who made a franchise-specific capital investment of either goods or services in New Jersey.  Thus the statute's own terms . . . will allow the application of the Act only in situations in which there are 'contacts' with the forum [and] 'interests' arising out of those contacts."  ISI III, 614 A.2d at 148 (citation omitted); see also N.J. Stat. Ann. § 56:10-4 (West 1989 & Supp. 1994) (statute limits itself to franchises "the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey").  Furthermore, under generally accepted choice-of-law analysis, the courts measure whether New Jersey has sufficient interests with the franchise as to make it appropriate to apply the NJFPA.

In this case the record is clear that it was the parties, not New Jersey, who contemplated that the franchisee maintain a place of business in New Jersey.  And it was the parties, not New Jersey, who bound themselves to an exclusive multistate distribution agreement.  Therefore, it is the parties' own agreement which operated to project the New Jersey law outside of New Jersey's borders, a result which CCC will find ironic but which inevitably follows from the choice-of-law analysis.

This factor distinguishes this situation from the cases relied on by the district court.  In those cases, the state laws

that were held to burden interstate commerce operated independent of any party's agreement.  In Healy and Brown-Forman, the states enacted price-affirmation statutes for beer and liquor, requiring suppliers to affirm that their prices in-state were no higher than the lowest price they would charge for their product in border states.  These laws were designed in such a way that a supplier's price in other states would be dependent on the prices it posted in the state enacting the regulation.  However, in these cases it was the state, operating independently of any parties' contract, which dictated the extraterritorial effect. As noted, the situation here is distinguishable.

Of course, if the parties were subject to "inconsistent legislation" from different states, a law's "practical effect" might lead to a Commerce Clause violation.  See, e.g., Healy, 491 U.S. at 336-37; CTS, 481 U.S. at 88-89; Brown-Forman, 476 U.S. at 582-83; MITE, 457 U.S. at 642-43.  On the other hand, state laws which merely create additional, but not irreconcilable, obligations are not considered to be "inconsistent" for this purpose.  See Buzzard v. Roadrunner Trucking, 966 F.2d 777, 784 n.9 (3d Cir. 1992).

In this case, there is no indication that any other state will impose demands on ISI or CCC which would require them to violate New Jersey law or vice versa.  And while the laws of other states might permit CCC to conduct its franchise relationship with ISI under a different framework than that imposed by the NJFPA, that difference in approach by different states is not sufficient to require per se invalidation.  See Old

Bridge Chems., 965 F.2d at 1293 (must show "actual conflict among state regulations" in order to demonstrate per se invalidity).

Thus the essence of CCC's objection, despite its assurance to the contrary, goes to New Jersey's decision on choice of law. Having accepted that decision, as we must, we see no facial conflict between the NJFPA and the dormant Commerce Clause.

## 2.

### Pike Balancing

Because the district court decided the NJFPA was per se invalid, it never considered whether the NJFPA passes the balancing test enunciated in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). The Supreme Court has explained that where the statute addresses a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Id. at 142.[18]

Inasmuch as the parties argued the Pike balancing test in the district court and before us, we will consider whether,

---

[18]. The Supreme Court has continued to recite, even if it has not applied, the Pike test as late as its last term, see C & A Carbone, Inc. v. Town of Clarkstown, 114 S. Ct. 1677, 1681 (1994); Oregon Waste Sys., Inc. v. Department of Envtl. Quality, 114 S. Ct. 1345, 1350 (1994), notwithstanding criticism of the Pike balancing by members of the Supreme Court, see, e.g., CTS, 481 U.S. at 95-96 (Scalia, J., concurring) and commentators, see Donald H. Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L. Rev. 1091, 1106-08 (1986).

again looking at the NJFPA from a facial standpoint only, it fails to meet requisite balancing. In doing so we do not balance one state's interests against another, as ISI suggests we should, but rather we balance the state's interest against the burden on interstate commerce. See MITE, 457 U.S. at 643; Aldens, Inc. v. Packel, 524 F.2d 38, 45-50 (3d Cir. 1975), cert. denied, 425 U.S. 943 (1976).

Furthermore, contrary to CCC's argument, we do not look at the effect of the state regulation on the commerce of other states when we balance. Instead, "[u]nder this court's precedent, the only incidental burdens on interstate commerce that implicate the commerce clause . . . are those that discriminate against interstate commerce. We have so held because the commerce clause is concerned with protectionism and the need for uniformity, and case law demonstrates that legislation will not be invalidated under the Pike test unless it imposes discriminatory burdens on interstate commerce. . . . Thus, where the burden on out-of-state interests rises no higher than that placed on competing in-state interests, it is a burden on commerce rather than a burden on interstate commerce." Old Bridge Chems., 965 F.2d at 1295 (citations omitted, first emphasis added); see also J. Filiberto Sanitation, Inc. v. New Jersey Dep't of Envtl. Protection, 857 F.2d 913, 922 (3d Cir. 1988); Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 406 (3d Cir. 1987).

As we explained in Ford Motor Co. v. Insurance Comm'r, 874 F.2d 926, 942-43 (3d Cir.), cert. denied, 493 U.S. 969

(1989), where we upheld a law prohibiting companies that were affiliated with savings and loan institutions anywhere in the country from selling insurance in Pennsylvania, the fact that a law may have "devastating economic consequences" on a particular interstate firm is not sufficient to rise to a Commerce Clause burden. Id. at 943. Instead, the inquiry requires that we examine whether the state law adversely affects interstate commerce. "[T]he focus [of the Supreme Court is on] . . . the manner by which the statute regulated [and] . . . the fact that the statute regulated indiscriminately compel[s] the conclusion that the Commerce Clause [has] not been violated." Id. at 944.

Applying this settled law, it is clear that there is no burden on interstate commerce inasmuch as the NJFPA is facially neutral as to the interstate nature of the parties' agreement. CCC claims the NJFPA imposes a straitjacket on its operations and ultimately harms consumers by prohibiting the creation of an efficient distribution system. But even assuming this to be true, it is indisputable that the statute simply does not differentiate between in-state and out-of-state franchisors. The limitation on termination of franchises to reasons of good cause is equally applicable to New Jersey-based franchisors as to those headquartered elsewhere. Thus, although the NJFPA may burden commerce, it creates no incidental burdens on interstate commerce for purposes of Pike balancing. "Once it is clear no such discrimination has been alleged, the inquiry as to the burden on interstate commerce should end." J. Filiberto, 857 F.2d at 922 (quotations and citations omitted). In the absence of such a

burden, an analysis of the "putative local benefits" of the NJFPA is unnecessary.[19]

In ISI's argument before this court, it expressly limited itself to the district court's facial analysis.  It thus recognized that the New Jersey Supreme Court's holding did not purport to consider whether the NJFPA might, when applied, have a burdensome effect on interstate commerce.  That issue, of course, could not be resolved as a matter of law, and indeed might have to await the interpretation given to the "good cause" provisions of the NJFPA.  Although the Commerce Clause analysis and the Due Process analysis are distinct, see supra note 17, ISI's counsel recognized that there might be due process implications to certain interpretations of the NJFPA in the context of existing contracts.  That issue was not raised by CCC in its pleadings in

---

[19].  Despite the district court's uncertainty about whether the New Jersey court's choice-of-law analysis was binding, the court applied New Jersey law when entering summary judgment for CCC on Counts Two through Seven.  We have reviewed ISI's objections to the district court's reasoning and agree with the independent state law grounds articulated by the court.

The district court also entered summary judgment for CCC on the part of Count One which alleged that CCC "fail[ed] to renew a franchise without good cause" under § 10-5 of the NJFPA. See N.J. Stat. Ann. § 56:10-5 (West 1989).  Both parties agree that there may be changes in a franchise agreement that are so significant that they amount to a constructive nonrenewal of the franchise.  In this case, however, the district court based its holding that the 1989 Agreement was a "renewal" of the 1984 Agreement on its decision that the elimination of the territory of eight states followed from the Commerce Clause. See ISI V, supra, at 80 n.47.  In light of our decision, we will reverse the entry of summary judgment on this ground as well to allow the district court to evaluate the nonrenewal claim anew.

this case,[20] and we consider it as beyond the scope of this appeal.

## III.

## **CONCLUSION**

For the foregoing reasons, we will deny the petitions for writs of mandamus docketed at Nos. 93-5490 and 93-5635; in the appeals docketed at Nos. 93-5414 and 94-5048, we will reverse the district court's judgment declaring the NJFPA unconstitutional as applied to activities of New Jersey franchisees outside of New Jersey and remand for further proceedings consistent with this opinion; and in the appeal docketed at No. 93-5722, we will affirm the district court's judgment for CCC on Counts Two through Seven, and reverse its judgment for CCC on the nonrenewal portion of Count One and remand for further proceedings consistent with this opinion. Costs in Nos. 93-5490, 93-5635, 93-5414 and 94-5048 to be assessed against CCC; costs in No. 93-5722 to be assessed against ISI.

---

[20]. The New Jersey Supreme Court's decision mentioned the due process clause, but we did not understand it to make a definitive ruling in that connection, and view that reference as part of its general discussion on the interpretation of the NJFPA.