**CITY OF CHESTER, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**Consolidated Rail Corporation, Petitioner,**

v.

**Public Utility Commission, Respondent.**

**County of Delaware, Petitioner,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 2, 2001.

Decided April 27, 2001.

Victor A. Young, Philadelphia, for petitioners.

Susan D. Colwell, Harrisburg, for respondent.

Jason D. Sharp, Harrisburg, for intervenor.

Before DOYLE, President Judge, PELLEGRINI, Judge, and LEDERER, Senior Judge.

PELLEGRINI, Judge.

Before this Court are three consolidated petitions for review filed by the City of Chester (City), the County of Delaware (County) and Consolidated Rail Corporation (Conrail) from an order of the Pennsylvania Public Utility Commission (PUC) allocating costs to each of those parties for the repair and maintenance of the Lloyd Street Bridge.

This case involves the Lloyd Street Bridge (Bridge), a three-span structure carrying Lloyd Street over the tracks of National Railroad Passenger Corporation (Amtrak) in the City of Chester, Delaware County, Pennsylvania. The Bridge, which was built in 1899 by the Pennsylvania, Washington and Baltimore Railroad Company to carry Lloyd Street over the railroad right-of-way, is owned by Amtrak which acquired the line of railroad from the Penn Central Railroad Company through Conrail. State Routes 13 and 291 are state highways that feed into or lead off from Lloyd Street near the crossing. Lloyd Street is a city street in the City of Chester. On May 29, 1997, the PUC issued an order affirming the action of the City in posting a five-ton weight limit on the Bridge due to its deteriorating condition. Because no concerned party agreed to accept responsibility for maintaining the structure until it could be replaced, the PUC entered an order instituting an investigation upon its own motion to determine the condition, disposition and responsibility for maintenance of the Bridge.

Public hearings were held before an Administrative Law Judge (ALJ) to determine which party or parties were to be held responsible for repairing and main-taining the Bridge. At the hearings, representatives of Amtrak testified that approximately 54 Amtrak passenger trains operated daily on the line at speeds of up to 90 m.p.h., and Conrail operated approximately four freight trains per day at speeds up to 45 m.p.h., but normally they traveled at 10 m.p.h. Amtrak had maintenance responsibilities for the rail line and facilities located at the subject crossing under its agreement with Conrail. Conrail made payments to Amtrak for its use of the line, and additional payments to serve as compensation for a portion of the financial responsibility for liability that Amtrak agreed to assume under the agreement and were meant to represent Conrail's fair and equitable share of the cost to Amtrak for Conrail's operations on the line. Amtrak's representative testified that Amtrak had maintained the Bridge in the past by removing cross-bracing that was loose, repairing a stringer, affixing protective shields on the Bridge to protect Amtrak's overhead electrical wires, and performing repairs on the Bridge to prevent any structural portions of the Bridge from coming in contact with the catenary wires. Amtrak representatives stated that Amtrak did not agree to perform any work or assume any costs for the repair or replacement of the Bridge. It was Amtrak's position that it was exempt under federal law from contributing to the costs of repairs and maintenance because such costs constituted a tax or fee.

Representatives for the City testified that the City had been declared financially distressed pursuant to the Municipalities Financial Recovery Act,[1] and was currently operating under a recovery plan adopted pursuant to that Act's provisions. The City was the party responsible for pursuing Bridge Bill funding for recon-

---

1. Act of July 10, 1987, P.L. 246, *as amended,* 53 P.S. §§ 11701.101—11701.501.

struction of the Bridge; however, no application had been made for federal or state funding in regard to the Bridge. The City had applied, though, to the Delaware County Planning Department for consideration for Bridge Bill funding to replace the Bridge. The City indicated that it benefited from the existence of the Bridge because it provided continuity to residential neighbors on both sides, provided a link between residential neighborhoods which encouraged walking and bicycling, and made the street safe for both auto traffic and other users; however, it did not agree to perform any work or assume any costs for any repairs to the Bridge. The City argued that Amtrak should not be excused from contributing to the costs because they did not constitute a tax or fee. It further argued that it would be unreasonable to order the City to pay to maintain the Bridge because it was a distressed municipality.

Representatives for the Southeastern Pennsylvania Transportation Authority (SEPTA) testified that in response to federal court decisions in which SEPTA was found not liable for the costs of highway bridge maintenance,[2] a consent decree was entered into between the PUC and SEPTA wherein the PUC agreed to refrain from assessing it costs or responsibility for the construction, maintenance or repair of any highway bridge.[3] In addition, they pointed out that SEPTA had not performed any work at the subject crossing and did not agree to assume any future maintenance responsibilities for any part of the Bridge or its approaches. However, they admitted that SEPTA received a benefit from the crossing because having a separated-grade crossing was preferable to

**2.** *See Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission,* 826 F.Supp. 1506 (E.D.Pa.1993) *(SEPTA II), affirmed per curiam,* 27 F.3d 558 (3rd Cir.1994), *cert. denied,* 513 U.S. 928, 115 S.Ct. 318, 130 L.Ed.2d 279 (1994), and *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission,* 802 F.Supp. 1273 (E.D.Pa.1992) *(SEPTA).*

**3.** Specifically, the consent decree provided in relevant part:

1. Under 49 U.S.C. §§ 24301(1) and 24501(g), the Commission is barred hereafter from assessing or continuing to asses upon SEPTA the cost or responsibility of or for design, construction, reconstruction, inspection, maintenance, removal of snow, ice, debris or graffiti, or repair ("Assessed Cost or Responsibility") of any Highway Bridge (further defined for this Consent Decree to also include all components, including without limitation, approaches, substructures and superstructures, highway decking, as well as railings, walls, fences and shielding of any kind, and stairways and ramps attached to the bridge (except where expressly accepted by SEPTA, either in writing to the Commission or on the record of a Commission proceeding, as a necessary part of an adjacent SEPTA-owned railroad station)), and all lighting, drainage and highway signage. The term "Highway Bridge" shall not include any railroad catenary attachment on a Highway Bridge, and shall not include any railroad facilities beneath a Highway Bridge.

2. SEPTA is relieved by the above-referenced federal law from any further obligations under all prior orders of the Commission (which is defined to also include its predecessor, the Pennsylvania Public Service Commission) assigning to SEPTA any Assessed Cost or Responsibility for any Highways Bridges at any above-grade crossings under the Commission's jurisdiction.

3. Unless permitted by subsequent amendment to, or repeal of, the above-referenced federal law, henceforth in all PUC above-grade crossing proceedings involving SEPTA railroad operations or SEPTA railroad rights-of-way, whether such proceedings are initiated by the Commission, SEPTA or by any other party, the Commission shall not assign to SEPTA, either on a temporary or permanent basis, any Assessed Cost or Responsibility in violation of SEPTA's statutory exemption with respect to Highway Bridges as set forth in paragraph no. 1 of this Consent Decree.

having an at-grade crossing. Representatives for the Pennsylvania Department of Transportation (PennDot), which had intervened in the matter, testified that PennDot did not receive any benefit from the Bridge. Specifically, they pointed out that any benefit inured to the City as the Lloyd Street crossing served as a collector street to City streets and to channel traffic into an arterial system that contained numerous roadways, only two of which were state highways. The primary purpose was to serve as a link for local neighborhood roads, and there was no evidence to conclude that Lloyd Street served as a necessary or vital link in the State highway system.

Conrail representatives testified that it had not performed any maintenance at the crossing but recognized that a benefit existed because it prevented accidents involving motor vehicles and trains and reduced Conrail's liability for the same. Nonetheless, it argued that it should not be responsible for any costs for repairs or maintenance because it did not own any property on the rail line and only operated on the line pursuant to an operating agreement with Amtrak for which it paid Amtrak a fee to maintain the rail line and facilities.

The ALJ issued a Recommended Decision allocating to the City 75% of the costs to furnish all materials and perform all work necessary to maintain the substructure, superstructure and deck of the Bridge. The remaining 25% of the costs were divided among Conrail (15%), the County (5%) and PennDot (5%). The ALJ determined that Amtrak was exempted from contribution based on federal law, as was SEPTA based on the consent decree between SEPTA and the PUC in an unrelated matter.

The City, Conrail, PennDot and the County filed exceptions to the Recommended Decision. The PUC denied all of the exceptions and issued an order adopting the ALJ's Recommended Decision specifically providing that the City was to perform the following work and incur the following costs and expenses with regard to the Bridge:

a. at its initial cost and expense, furnish all materials and perform work necessary to maintain the substructure, superstructure and deck of the Lloyd Street rail-highway bridge crossing; all in a safe and satisfactory condition;

b. bear all of the remaining costs in furnishing material and performing work in accordance with ordering paragraph No. 7 hereof;

c. at its sole cost and expense, within 120 days from the date of entry of this Opinion and Order, perform an in-depth inspection of the entire structure and prepare and submit to our Bureau of Transportation and Safety, and to all Parties hereto, a detailed in-depth inspection report which shall include, *inter alia,* a structural analysis of the bridge, its load-carrying capacity, what maintenance work the City of Chester has performed since the date of entry of the instant Opinion and Order, any changes in the condition of the bridge, which would affect the safety and well being of the traveling public, any specific recommendations as to what additional repairs and/or work should be performed and when same will be done, together with the status of its efforts to secure funding for bridge replacement. In addition to the foregoing, the City of Chester, at its sole cost and expense, shall perform an in-depth inspection of the structure at least once every year thereafter and shall submit to the Commission and the Parties a detailed in-depth inspection report setting forth therein the foregoing items of information;

d. at least fifteen (15) days prior to the start of each inspection and/or maintenance work, shall notify all interested Parties of the actual date on which each such inspection and/or work shall begin;

e. shall reimburse the Consolidated Rail Corporation for 85% of the costs incurred by Conrail in complying with Ordering Paragraph 13 [4] in the following proportions:

 (a) City of Chester—75%

 (b) The County of Delaware—5%

 (c) Pennsylvania Department of Transportation—5%

■ The City, County and Conrail filed petitions for review [5] from that order that have been consolidated for appeal and are now before this Court.[6]

**I.**

■ Initially, the City, County and Conrail contend that the PUC erred in failing to allocate any costs to either Amtrak and/or SEPTA based on this Court's decision in *City of Philadelphia v. Pennsylvania Public Utility Commission*, 676 A.2d 1298 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 546 Pa. 657, 684 A.2d 558 (1996), *cert. denied*, 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997). In *City of Philadelphia*, we held that both Amtrak and SEPTA were to be allocated costs associated with the repair and maintenance of certain bridges. As to Amtrak, we determined that although it was ex-

empted from paying taxes imposed by a state agency pursuant to 49 U.S.C. § 23401(*l*), the allocation of costs did not constitute a tax. Regarding SEPTA, we found that the consent decree between the PUC and SEPTA did not bind this Court and deprived the parties that were not a party to that decree of their due process right to a full and fair hearing.

■ While acknowledging our decision, the PUC, nonetheless, explains that it chose to follow federal law instead which precludes allocating costs to Amtrak due to a permanent injunction, *see National Railroad Passenger Corporation v. Pennsylvania Public Utility Commission and Township of Tredyffrin*, 848 F.2d 436 (3d Cir.1988), *cert. denied*, 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988), and the consent decree which precludes allocating costs to SEPTA. Regarding Amtrak's exclusion from any cost allocation and the PUC's reliance on federal law, we stated in *City of Philadelphia* that decisions of inferior federal courts are not binding on state courts. *Rader v. Pennsylvania Turnpike Commission*, 407 Pa. 609, 182 A.2d 199 (1962); *Lilley v. Johns–Manville Corporation*, 408 Pa.Super. 83, 596 A.2d 203 (1991), *petition for allowance of appeal denied*, 530 Pa. 644, 607 A.2d 254 (1992). Further, because state courts share responsibility for the application and enforcement of federal law, state courts may interpret federal law. *Howlett v. Rose*, 496 U.S. 356, 110

---

**4.** Paragraph 13 provides: That the Consolidated Rail Corporation, at its initial cost and expense, provide watchmen and flagmen, if necessary, and any and all other protection necessary for all rail operations, including those of Conrail, Amtrak, and SEPTA, during performance of the maintenance and inspection work ordered in Ordering Paragraphs 7, 10 and 11 hereof.

**5.** Neither Amtrak nor SEPTA participated in the appeal. PennDot did not file an appeal.

**6.** Our scope of review of the PUC's order is to determine whether constitutional rights were violated, whether errors of law were committed, or whether findings of fact are supported by substantial evidence. *Atglen–Susquehanna Trail, Inc. v. Pennsylvania Public Utility Commission*, 717 A.2d 581 (Pa.Cmwlth.1998), *petition for allowance of appeal denied*, 559 Pa. 695, 739 A.2d 1059 (1999).

S.Ct. 2430, 110 L.Ed.2d 332 (1990). "Although having concurrent rather than subordinate jurisdiction to decide the issue of federal law before us, we would nonetheless normally find the Third Circuit decision of great probity in interpreting the federal statute. However, that does not hold true when there is a circuit court split and our own analysis reveals that the Third Circuit is clearly wrong." *City of Philadelphia*, 676 A.2d at 1305 n. 10. Because the PUC is a state administrative agency over which state courts have jurisdiction to determine what law it is to apply, including the interpretation of a federal law unless reversed by the United States Supreme Court, it was required to apply the holding in *City of Philadelphia* to this case.

 As to holding that SEPTA is not responsible for its share of crossing costs because it had entered into a consent decree that in future cases it would not allocate any cost that was its fair share for maintaining a crossing, that consent decree cannot in any way bind anyone not a party to that agreement. None of the parties to the proceeding underlying this appeal were a party to the proceeding involving the consent decree, and by deferring to the consent decree, the PUC is violating the due process rights of those who were not a party to that settlement.[7] Because the PUC is constrained to follow *City of Philadelphia*, this case is remanded to the PUC to conduct an additional hearing for the purpose of determining the

allocation of costs associated with the Bridge that include Amtrak and SEPTA as well as all of the other parties involved.[8]

## II.

 The City also contends that the PUC erred by allocating to it 75% of the costs of maintaining and repairing the Bridge because it has been designated a financially distressed municipality under the Municipalities Financial Recovery Act and is fiscally unable to make the repairs and provide the maintenance as ordered. It explains that the City adopted a Municipal Recovery Plan pursuant to Section 245 of the Act, 53 P.S. § 11701.245, under which it currently operates in order to operate on a balanced budget basis and provides the following excerpts from the Introduction to the Recovery Plan in support of the proposition that it is financially unable to contribute to the Bridge's repairs and maintenance:

> The City has operated for several years with a major imbalance between revenues and expenditures. Practically speaking the City has only limited ability to raise additional funds through taxation or borrowing, and current police and fire contracts restrict expenditure reductions. There are now few available alternatives for the City to pursue to achieve a balanced budget.

> The City's ability to resolve its financial crisis outside of bankruptcy is absolutely dependent upon the aggressive imple-

---

7. In *City of Philadelphia*, we noted:

> The PUC entry into a consent decree is problematic. The municipalities or private entities could make valid arguments that neither the federal courts or this court has considered. By entering into the consent decree agreeing not to allocate any costs to SEPTA, the PUC has prejudged those arguments and deprives those parties of their due process right to a full and fair hearing.

Of course, we are not bound by the consent decree.

*Id.* at 1307 n. 16.

8. The City, County and Conrail also contend that the PUC failed to consider relevant factors when determining the allocation of costs. As evidenced by the fact that we are remanding this case for an additional hearing so that the PUC can include Amtrak and SEPTA in the cost allocation, we obviously agree.

mentation of this Recovery Plan in connection with the strong leadership of the Mayor and City Council. The Plan calls for the introduction of strong central administration of the City, professional management of day-to-day operations, strict and consistent budgetary, purchasing and other basic financial management controls and drastic reduction of operating expenditures.

\* \* \*

If all of these steps are taken by the City, there is an opportunity for the City to climb out of fiscal chaos. Without their successful implementation, the City's future is bleak and its fiscal options few.

The PUC, however, argues that despite the City's financial status, which it contends is not controlling in determining the proper cost allocation, the City was the party responsible for pursuing the Bridge Bill funding for reconstruction of the Bridge. Additionally, it derives benefits from the existence of the Bridge because it provides continuity to residential neighbors on both sides and provides a link between residential neighborhoods and makes the crossing safe for traffic. We agree.

■ Initially, we should note that nothing in the Act provides that a municipality should get any consideration from paying bills due and owing or that it is otherwise exempt. The financial condition of a party and its ability to pay the fees associated with the cost of maintaining a crossing is not controlling or determinative for purposes of allocating costs regardless of the party. *East Rockhill Township v. Pennsylvania Public Utility Commission,* 115 Pa.Cmwlth. 228, 540 A.2d 600 (1988). Amtrak and SEPTA both have financial difficulties but that does not mean they should be excluded from the cost allocation for

that reason. The costs associated with the maintenance and repair of the Bridge are costs of doing business and are no different than when the City buys materials or supplies for which its financial condition is not given any consideration, and the PUC was correct by not considering the City's financially distressed status when allocating costs.

### III.

The County also contends that the PUC violated its due process rights by failing to provide it with notice of any of the hearings underlying this appeal, and, therefore, it cannot impose any obligation upon it for payment of costs associated with the Bridge. However, all that the record contains is a copy of a return receipt dated October 8, 1997, signed for by an agent of the County and does not provide us with enough information to make such a determination. Nonetheless, because we are remanding this case for an additional hearing to supplement the record, the County is on notice and can provide any evidence or call any witnesses that it believes the PUC should consider without sustaining any prejudice or due process violation. *See Katruska v. Bethlehem Center School District,* —— Pa. ——, 767 A.2d 1051 (2001).

Accordingly, for all of the above-stated reasons, the case is remanded to the PUC for an additional hearing and to reapportion costs associated with repairing and maintaining the Lloyd Street Bridge crossing between the parties, including Amtrak and SEPTA.

### ORDER

AND NOW, this 27th day of April, 2001, the order of the Pennsylvania Public Utility Commission dated September 1, 2000, is vacated, and the case is remanded to the

Pennsylvania Public Utility Commission to hold an additional hearing and issue an adjudication to apportion costs for the repair and maintenance of the Bridge between the present parties, the National Railroad Passenger Corporation, and the Southeastern Pennsylvania Transportation Authority in accordance with the foregoing opinion within 120 days of this order. The PUC is directed to certify a supplemental record within 20 days after that order and the chief clerk is directed to establish a briefing schedule where any of the parties may set forth reasons why the PUC decision is erroneous. We retain jurisdiction.