

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-27-2003

# Natl RR Passenger v. PA Pub Util Comm

Precedential or Non-Precedential: Precedential

Docket No. 02-3047P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Natl RR Passenger v. PA Pub Util Comm" (2003). *2003 Decisions.* Paper 295.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/295

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———————

No. 02-3047

———————

NATIONAL RAILROAD PASSENGER CORPORATION

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION;
GLEN THOMAS, CHAIRMAN, PENNSYLVANIA PUBLIC
UTILITY COMMISSION; ROBERT K. BLOOM,
VICE CHAIRMAN, PENNSYLVANIA PUBLIC UTILITY
COMMISSION; AARON WILSON, JR., COMMISSIONER,
PENNSYLVANIA PUBLIC UTILITY COMMISSION;
TERRENCE J. FITZPATRICK, COMMISSIONER,
PENNSYLVANIA PUBLIC UTILITY COMMISSION,

Appellants

———————

No. 02-3148

———————

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION,

Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 01-cv-05570, 95-cv-04500)
District Judge:  Hon. Jan E. DuBois

————

Argued June 23, 2003

Before:  SLOVITER, AMBRO, and BECKER, <u>Circuit</u> <u>Judges</u>

(Filed:   August 27, 2003)

————

Susan D. Colwell    (Argued)
   Assistant Counsel
Robert J. Longwell
   Deputy Chief Counsel
Bohdan R. Pankiw
    Chief Counsel
Pennsylvania Public Utility Commission
Harrisburg, PA l7l05

        Attorneys for Appellants in No. 02-3047
                and Appellant in No. 02-3148

John L. Moore, Jr.   (Argued)
Daniel J. Layden
Piper Rudnick
Washington, D.C.  20036

        Attorneys for Appellee in No. 02-3047

David P. Bruton    (Argued)
Drinker, Biddle & Reath
Philadelphia, PA l9l03

        Attorney for Appellee in No. 02-3148

SLOVITER, Circuit Judge.

This case is one in a long line of disputes between on one side the Pennsylvania Public Utility Commission ("PUC") and on the other side the National Railroad Passenger Corporation ("Amtrak"), and/or in a separate but related dispute the Southeastern Pennsylvania Transportation Authority ("SEPTA"), concerning the PUC's assignment of costs and responsibilities for maintaining and repairing rail-highway crossings in Pennsylvania. The PUC appeals[1] from the District Court's order which: (1) denied the motions of the PUC and PUC Commissioner Aaron Wilson, Jr., to dismiss Amtrak's complaint; (2) granted SEPTA's motion to enforce the Consent Decree it previously entered into with the PUC in federal court; and (3) granted in part and denied in part Amtrak's motion for preliminary and other injunctive relief and its renewed motion for declaratory judgment and preliminary injunctive relief. SEPTA v. Pa. PUC, 210 F. Supp. 2d 689, 729-30 (E.D. Pa. 2002) ("SEPTA"). We will affirm.

## I.

### FACTS AND PROCEDURAL BACKGROUND

The PUC is a state commission with a mandate to determine "the manner and conditions in or under which [railroad crossings] shall be maintained, operated, and

---

[1]According to the notices of appeal, the PUC alone appeals from the District Court's order as it relates to the SEPTA action. The PUC and its Commissioners appeal from the order as it relates to the Amtrak action.

protected to effectuate the prevention of accidents and the promotion of the safety of the public." 66 Pa. Cons. Stat. Ann. § 2702(b). As part of its duties, the PUC has responsibility for allocating the maintenance costs for railroad crossings in Pennsylvania among the parties having an interest in the particular crossing. 66 Pa. Cons. Stat. Ann. § 2704. This dispute centers on the PUC's assignment of the costs for maintenance and repair of the Lloyd Street Bridge, in Chester, PA, although the ramifications are wider.

**A.**

**History of Litigation Between the PUC, Amtrak, and SEPTA**

Both Amtrak and SEPTA have been involved in a recurring legal battle with the PUC concerning its attempt to assess them a portion of the maintenance costs for railroad crossings. The dispute arises from their differing interpretations of Amtrak's exemption from state and local taxes and fees contained in the Rail Passenger Service Act ("RPSA"), which provides:

> **(*l*) Exemption from taxes levied after September 30, 1981.– (1) In general.–** Amtrak, a rail carrier subsidiary of Amtrak, and any passenger or other customer of Amtrak or such subsidiary, are exempt from a tax, fee, head charge, or other charge, imposed or levied by a State, political subdivision, or local taxing authority on Amtrak. . . after September 30, 1981. In the case of a tax or fee that Amtrak was required to pay as of September 10, 1982, Amtrak is not exempt from such tax or fee if it was assessed before April 1, 1997.

49 U.S.C. § 24301(*l*)(1) (2003).

The statutory history and legislative purpose behind enactment of the RPSA were discussed in some detail by the Supreme Court in Nat'l R.R. Passenger Corp. v. Atchison,

4

Topeka & Santa Fe Railway Co., 470 U.S. 451, 453-55 (1985). In that opinion, the Court noted that Congress passed the RPSA in 1970 as a response to the significant decline in the number of operating rail passenger trains and the "tremendous operating losses" suffered by those passenger services still in operation. Id. at 454. The RPSA was Congress' effort to revive the passenger train industry by reorganizing and restructuring the rail passenger system. Id. As part of the RPSA, Congress created Amtrak and provided private railroads the opportunity to transfer their passenger-service obligations to Amtrak, which Congress had established for that purpose. Id. at 454-55. All but five private railroads offering intercity passenger service contracted with Amtrak to transfer their obligations. Id. at 456.

We explained in Nat'l R.R. Passenger Corp. v. Pa. PUC, 848 F.2d 436, 438 (3d Cir.), cert. denied, 488 U.S. 893 (1988) ("Amtrak II"), that despite federal subsidies, Congress recognized that Amtrak suffered losses in its first decade, and its financial situation was bleak. In a 1980 report, the Department of Transportation estimated that state and local taxes would cost Amtrak more than $14 million in 1981. S. Rep. No. 253, 97th Cong., 1st Sess. 103 (1981). The Senate Appropriations Committee noted that "[i]t is generally recognized that State and local taxes on a primarily Federal investment are inappropriate," and that "such taxation serves to erode the revenue-to-cost ratios which impact on whether States and localities continue to receive the benefits of Amtrak service." Id. Based on this reasoning, Congress deferred for one year Amtrak's payment

5

of any state or local taxes.  Pub. L. No. 97-102, 95 Stat. 1442, 1451 (1981).

The following year, Congress revisited the matter and "converted Amtrak's temporary exemption into a continuing one."  Amtrak II, 848 F.2d at 438.  A Senate Committee Report concluded that "[a]t a time when local jurisdictions are demanding that nationwide rail passenger service be maintained, it seems reasonable to provide for a 'user contribution' whereby those areas receiving the service in turn contribute to Amtrak's continued existence through tax relief."  S. Rep. No. 516, 97th Cong., 2d Sess. 170 (1982).  The statutory exemption from state and local taxes and fees was codified at 45 U.S.C. § 546b, which has since been recodified at 49 U.S.C. § 24301(*l*)(1).[2]

Based on this statutory exemption, Amtrak and SEPTA have repeatedly contested the PUC's attempts to assess them for maintenance costs for crossings.  E.g., Nat'l R.R. Passenger Corp. v. Pa. PUC, 665 F. Supp. 402 (E.D. Pa. 1987) ("Amtrak I"), aff'd., Amtrak II, 848 F.2d 436 (3d Cir.), cert. denied, 488 U.S. 893 (1988); Nat'l R.R. Passenger Corp. v. Pa. PUC, No. Civ. A. 86-5357, 1991 WL 998 (E.D. Pa. Jan. 2, 1991) ("Amtrak III"); Nat'l R.R. Passenger Corp. v. Pa. PUC, No. Civ. A. 86-5357, 1997 WL 587278 (E.D. Pa. Sept. 10, 1997) ("Amtrak IV"); Nat'l R.R. Passenger Corp. v. Pa. PUC, No. Civ. A. 86-5357, 1997 WL 597963 (E.D. Pa. Sept. 15, 1997) ("Amtrak V"); Nat'l R.R. Passenger Corp. v. Pa. PUC, No. Civ. A. 86-5357, 1998 WL 103377 (E.D. Pa. Feb.

---

[2]The exemption as set forth in the text infra was expanded in 1997 to apply not only to taxes or fees imposed by a State, political subdivision or local taxing authority but also to a "head charge or other charge" imposed by such entities.  Pub. L. 105-134, § 208.

23, 1998) ("Amtrak VI"); SEPTA v. Pa. PUC, 592 A.2d 797 (Pa. Commw. Ct. 1991), alloc. denied, 611 A.2d 714 (Pa. 1992) ("SEPTA I"); SEPTA v. Pa. PUC, 592 A.2d 808 (Pa. Commw. Ct. 1991), alloc. denied, 611 A.2d 714 (Pa. 1992) ("SEPTA II"); SEPTA v. Pa. PUC, 802 F. Supp. 1273 (E.D. Pa. 1992) ("SEPTA III"); SEPTA v. Pa. PUC, 826 F. Supp. 1506 (E.D. Pa. 1993) ("SEPTA IV"); SEPTA v. Pa. PUC, No. Civ. A. 95-4500, 1999 WL 639946 (E.D. Pa. Aug. 23, 1999) ("SEPTA V").

Two of the opinions listed above have particular relevance for the issues before us. In Nat'l R.R. Passenger Corp. v. Pa. PUC, 665 F. Supp. 402 (E.D. Pa. 1987) ("Amtrak I"), Amtrak challenged a PUC order that assessed against Amtrak costs required for the replacement and maintenance of the Cassatt Avenue Bridge, also in Chester, PA. The district court granted Amtrak's motion for summary judgment against the PUC, finding that Amtrak was exempt from the PUC's assessments under the RPSA.[3] Id. at 412. The

_____

[3] The district court's analysis was based on the RPSA's exemption as codified in 45 U.S.C. § 546b. That section was subsequently repealed and reenacted in 1994 and recodified at 49 U.S.C. § 24301(*l*)(1), the section at issue in this appeal.

Section 546b provided:

Notwithstanding any other provision of law, the National Railroad Passenger Corporation (the "Corporation") shall be exempt from any taxes or other fees imposed by any State, political subdivision of a State, or local taxing authority which are levied on the Corporation, or any railroad subsidiary thereof, from and after October 1, 1981, including such taxes and fees levied after September 30, 1982 . . . . Notwithstanding the provision of section 1341 of Title 28, the United States district courts shall have original jurisdiction over any civil actions brought by the Corporation to enforce the exemption conferred hereunder and may grant equitable or declaratory relief as requested by the Corporation.

7

district court held that "[t]he extensive federal involvement [in] Amtrak's management, finances and operations make it apparent that the legislative exemptions should be liberally construed to effectuate its goals." Id. at 411. In addition, the court reasoned that application of the exemption was necessary to prevent the diversion of federal funds from use for Amtrak operations and to guarantee Amtrak's fiscal integrity. Id. at 410-11. Consequently, the district court enjoined the PUC from assessing against Amtrak costs regarding the Cassatt Avenue Bridge. Id. at 412.

The PUC appealed to this court. In Amtrak II, we affirmed the district court's order, holding that "Amtrak's immunity from local 'taxes or other fees'. . . extends to assessments for local improvements of the kind at issue [for the Cassatt Avenue Bridge]." 848 F.2d at 440. It should be noted that the PUC's attempt to interest the Supreme Court in the issue was unsuccessful. See 488 U.S. 893 (1988).

Thereafter, litigation between the PUC and SEPTA pending in federal court was resolved by a Consent Decree entered into by the two parties on January 23, 1996. See SEPTA v. Pa. PUC, Civ. A. No. 95-CV-4500 (E.D. Pa. Jan. 23, 1996); SEPTA App. at 161. The Consent Decree, which bars the PUC from assessing costs against SEPTA, was based on the outcome and language of related cases. In SEPTA v. Pa. PUC, 826 F. Supp. 1506 (E.D. Pa. 1993) ("SEPTA IV"), the district court held that SEPTA was exempt from the PUC's assessment of maintenance costs for four bridge crossings pursuant to the

RPSA section, 45 U.S.C. § 581(c)(5),[4] which confers tax immunity on commuter authorities "to the same extent as" Amtrak. Id. at 1526 n.24. Thereafter, the Commonwealth Court acknowledged that "[t]he PUC and this Court have duly recognized the federal preemption of the subject matter of state and local assessment of charges against Amtrak for repair or replacement of railroad crossings." Consolidated Rail Corp. v. Pa. PUC, 671 A.2d 248, 252 (Pa. Commw. Ct. 1995). With this background, the PUC agreed to the Consent Decree with SEPTA.

The PUC accurately describes the Consent Decree as requiring it to "refrain from assessing costs or responsibilities in future cases involving highway bridges against SEPTA." PUC's Br. at 9 (emphasis added). Specifically, the Consent Decree provides that the PUC "is barred hereafter from assessing or continuing to assess upon SEPTA the cost or responsibility of or for design, construction, reconstruction, inspection, maintenance, removal of snow, ice, debris or graffiti, or repair . . . of any Highway Bridge

---

[4]Section 581(c)(5) was repealed in 1994, Pub. L. 103-272, § 7(b), 108 Stat. 1379, and incorporated in 49 U.S.C. § 24501(g). Section 24501(g) was subsequently repealed in 1997. Pub. L. 105-134, Title I, § 106(a), 111 Stat. 2573. That section was amended, with linguistic but no substantive changes, and recodified at 49 U.S.C. § 24301(f), which states:

> **Tax exemption for certain commuter authorities.**—A commuter authority that was eligible to make a contract with Amtrak Commuter to provide commuter rail passenger transportation but which decided to provide its own rail passenger transportation beginning January 1, 1983, is exempt, effective October 1, 1981, from paying a tax or fee to the same extent as Amtrak is exempt.

9

. . . ." SEPTA App. at 163. Moreover, the Consent Decree states:

> Unless permitted by subsequent amendment to, or repeal of, [49 U.S.C. §§ 24301(*l*) and 24501(g)], henceforth in all PUC above-grade crossing proceedings involving SEPTA railroad operations or SEPTA railroad rights-of-way, whether such proceedings are initiated by the [PUC], SEPTA or by any other party, the [PUC] shall not assign to SEPTA, either on a temporary or on a permanent basis, any Assessed Cost or Responsibility in violation of SEPTA's statutory exemption with respect to Highway Bridges . . . .

SEPTA App. at 164-65. The Consent Decree also provides that the District Court "shall retain jurisdiction over this action to enforce the provisions of this Consent Decree, including any claims of SEPTA arising out of the [PUC's] failure to comply with SEPTA's federal statutory exemption." SEPTA App. at 172.

**B.**

**Lloyd Street Bridge Dispute**

In accordance with its statutory mandate, the PUC initiated an investigation of the Lloyd Street Bridge in 1997 to determine the condition of the bridge and to assign responsibility for its maintenance. The Lloyd Street Bridge, located in Chester, Pennsylvania, provides a street crossing over railroad tracks used by Amtrak and SEPTA. At a Field Conference held on July 14, 1997, the PUC discovered that "no concerned party agreed to accept responsibility for maintaining the structure." Amtrak App. at 104.

A PUC Administrative Law Judge ("ALJ") held an evidentiary hearing and issued a Recommended Decision on March 14, 2000, assigning costs to parties with an interest

10

in the bridge. The City of Chester ("Chester"), Amtrak, Consolidated Rail Corporation ("Conrail"), the Pennsylvania Department of Transportation ("PennDOT"), and Delaware County each filed exceptions to the decision with the PUC. On September 1, 2000, the PUC entered an order ("2000 Order") denying all exceptions and adopting the ALJ's Recommended Decision. The PUC order assigned 75% of the maintenance costs to Chester, with the remaining 25% divided between Conrail (15%), PennDOT (5%), and Delaware County (5%). The PUC did not assess any of the bridge maintenance costs to Amtrak or SEPTA, finding that they were exempt from contribution.[5]

Chester, Conrail, and Delaware County appealed from the PUC's 2000 Order to the Pennsylvania Commonwealth Court. City of Chester v. Pa. PUC, 773 A.2d 1280 (Pa. Commw. Ct.), alloc. denied, 788 A.2d 379 (Pa. 2001), cert. denied, 122 S. Ct. 1349 (U.S. 2002). The Commonwealth Court vacated the PUC's order, holding that Amtrak and SEPTA were not exempt from the assessment of maintenance costs. Id. at 1285-86. Accordingly, the Court remanded the issue to the PUC for a hearing and adjudication "to apportion costs for the repair and maintenance of the Bridge between the present parties, [Amtrak], and [SEPTA] . . . ." Id. at 1288.

After a hearing, the ALJ issued a second Recommended Decision on August 7, 2001. The PUC subsequently entered an order on September 7, 2001 ("2001 Order"),

---

[5]The 2000 Order required Amtrak and SEPTA to, "at their respective sole cost and expense, furnish all material and perform all work necessary to maintain their facilities, property and attachments to the bridge, if any, at the crossing, and the approaches thereto; all in a safe, satisfactory, and fully operational condition." Amtrak App. at 121.

11

modifying the ALJ's Recommended Decision and allocating the maintenance costs to: Chester (75%), Amtrak (5%), SEPTA (5%), Norfolk Southern Railway Corporation (5%), Delaware County (5%), and PennDOT (5%). The PUC's 2001 Order also required Amtrak and SEPTA each to cover 45% of the cost of providing watchmen, flagmen, and railroad protection during the maintenance work.

Amtrak filed a motion in the District Court for the Eastern District of Pennsylvania before Judge Newcomer seeking to expand the Cassatt Avenue Bridge injunction, previously issued by Judge Newcomer in Amtrak I, to prohibit assessments against Amtrak for all bridge crossings in the PUC's jurisdiction. See SEPTA, 210 F. Supp. 2d at 701. SEPTA filed a motion to intervene in the action. See id. On October 16, 2001, Judge Newcomer denied both motions, holding that Amtrak failed to demonstrate that the PUC violated the injunction with respect to the Cassatt Avenue Bridge. See id. at 701-02.

Amtrak and SEPTA then filed separate actions in the District Court for the Eastern District of Pennsylvania, which were assigned to Judge DuBois. Amtrak sought an injunction prohibiting the PUC from assigning it costs for maintenance of the Lloyd Street Bridge.[6] SEPTA filed a motion to enforce the Consent Decree it had entered into

_____

[6]In the Amtrak action, there were five pending motions: (1) Motion of the PUC to Dismiss the Verified Complaint in Equity filed by Amtrak; (2) Motion of Commissioner Aaron Wilson, Jr., to Dismiss the Verified Complaint in Equity filed by Amtrak; (3) Norfolk Southern's Motion to Intervene as Intervenor/Defendant; (4) Motion of Amtrak for Preliminary and Other Injunctive Relief; and (5) Amtrak's Renewed Motion for Declaratory Judgment and for Preliminary and Permanent Injunction. Id. at 694.

with the PUC in federal court.[7]

On July 12, 2002, the District Court entered an order denying the motions of the PUC and Commissioner Wilson to dismiss Amtrak's complaint. Id. at 729. The order also granted SEPTA's motion to enforce the Consent Decree, enjoined the PUC from assessing costs to SEPTA, and enjoined all parties to the PUC proceedings from enforcing or seeking to enforce any judicial or administrative order that would assess costs against SEPTA with respect to the Lloyd Street Bridge. Id.

Finally, the District Court granted in part and denied in part Amtrak's motion for preliminary and other injunctive relief and its renewed motion for declaratory judgment and preliminary injunctive relief. Id. The Court: (1) preliminarily enjoined the PUC from assessing to Amtrak costs and responsibilities for the Lloyd Street Bridge and from relitigating in state court the extent of Amtrak's exemption, as decided by Amtrak II, as to the Lloyd Street Bridge and (2) preliminarily enjoined the parties to the PUC proceedings from enforcing or seeking to enforce any judicial or administrative order that would assess costs against Amtrak with respect to the Lloyd Street Bridge.[8] Id. at 729-30.

---

[7]In the SEPTA action, two motions were pending: (1) Motion of SEPTA to Enforce the Consent Decree and (2) Norfolk Southern's Motion to Intervene as Intervenor/Defendant. Id.

[8]The order also denied Norfolk Southern's motions to intervene in the SEPTA and Amtrak cases, denied without prejudice Amtrak's request for permanent injunctive and declaratory relief, and denied without prejudice Amtrak's request for declaratory and injunctive relief with respect to bridges other than the Lloyd Street Bridge. Id. at 729-30.

13

## II.

## DISCUSSION

As the PUC points out, the issue before this court is not whether Amtrak and SEPTA are exempt from the PUC's assessment of costs. Rather, the issues on appeal are limited to the PUC's asserted affirmative defenses and procedural arguments raised before the District Court.

### A.

### Jurisdiction

The District Court had jurisdiction over the Amtrak action pursuant to the RPSA, 49 U.S.C. § 24301(*l*)(2), and 28 U.S.C. § 1331. The District Court had jurisdiction over the SEPTA action pursuant to its retention of jurisdiction under the Consent Decree. We have jurisdiction over interlocutory orders granting injunctions pursuant to 28 U.S.C. § 1292(a)(1). Although the two appeals have not been consolidated, we consider them in one opinion because the District Court did likewise and the issues and the background are interrelated.

### B.

### Amtrak Litigation

In the Amtrak action, the District Court preliminarily enjoined the PUC from assessing costs against Amtrak for the Lloyd Street Bridge and preliminarily enjoined the PUC, and all other parties to the PUC proceedings, from seeking to enforce any judicial

14

or administrative order against Amtrak related to the Lloyd Street Bridge. The PUC argues that the District Court erred by (1) not granting the PUC immunity under the Eleventh Amendment, (2) not dismissing Amtrak's complaint against Commissioner Wilson, (3) not granting the Commonwealth Court's order full faith and credit, and (4) granting relief that fails to meet the requirements of the Declaratory Judgment Act ("DJA").

## 1. Eleventh Amendment Immunity

The District Court rejected the PUC's claim that it was entitled to Eleventh Amendment immunity. SEPTA, 210 F. Supp. 2d at 716. The Court reasoned that the PUC was collaterally estopped from claiming such immunity or, in the alternative, that the PUC Commissioners were amenable to suit under the doctrine of Ex parte Young.[9] Id. at 715-16. The PUC argues that the District Court erred in applying collateral estoppel to bar it from raising its immunity defense. It also argues that Ex parte Young is inapplicable to Amtrak's claims because they ultimately targeted the PUC, not its Commissioners as individuals.

Although our court has applied different standards of review where collateral estoppel is in issue, we will apply plenary review. Nat'l R.R. Passenger Corp. v. Pa. PUC, 288 F.3d 519, 524-25 (3d Cir. 2002) ("Amtrak VIII"), cert. denied, 123 S. Ct. 2220 (U.S. 2003). The elements for collateral estoppel are satisfied when: "(1) the issue sought

---

[9]Ex parte Young, 209 U.S. 123 (1908).

15

to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." Id. at 525 (citations omitted).

The PUC first raised Eleventh Amendment immunity in Amtrak V as a defense to a motion filed by Amtrak seeking to enjoin the PUC from assessing it the costs of repairing and maintaining bridges. The District Court rejected the PUC's defense, holding that the PUC is not an arm or alter ego of the state and therefore is not protected by such immunity. 1997 WL 597963, at *10. The court analyzed the three factors identified in Christy v. Pa. Tpk. Comm'n, 54 F.3d 1140, 1144-45 (3d Cir. 1995): (1) whether the payment of the judgment would come from the state; (2) the status of the agency under state law; and (3) the agency's degree of autonomy. Amtrak V, 1997 WL 597963 at *6. Although the court found that factors (2) and (3) favor, if only slightly, the PUC, the court denied Eleventh Amendment immunity because factor (1), "the most important factor," weighed heavily against the PUC. Id. at *10.

The PUC again raised sovereign immunity as a defense in a suit brought by Amtrak seeking an injunction against PUC proceedings to construct passenger platforms at Amtrak stations. Amtrak VIII, 288 F.3d at 522. The district court found that the PUC was collaterally estopped from raising sovereign immunity. In one of the most important decisions for our purposes in this series of cases, we affirmed, holding that the PUC was collaterally estopped from raising Eleventh Amendment immunity in a proceeding against

16

Amtrak. Id. at 532.

Applying the requirements for collateral estoppel, we held that: (1) the issue of Eleventh Amendment immunity was "fully considered and determined" in Amtrak V, id. at 526; (2) the issue of sovereign immunity was actually litigated in Amtrak V, id. at 527; (3) the prior court's holding that the PUC was not entitled to such immunity "was necessary to the outcome of the proceeding," id.; (4) the proceedings involved the same parties, even though the prior proceedings did not name individual Commissioners as parties, id.; and (5) no equitable concerns counseled against application of collateral estoppel. Id. at 532.

Our holding in Amtrak VIII directly refutes the arguments the PUC raises now. Contrary to the PUC's contention here, we did hold that collateral estoppel may be applied to preclude the PUC from asserting the defense of Eleventh Amendment immunity. Although the PUC continues to argue before us that the district court's denial of sovereign immunity in Amtrak V was not essential to the judgment in that case, we expressly concluded in Amtrak VIII that "the District Court [in Amtrak V] held that the PUC was not entitled to Eleventh Amendment immunity and this holding was necessary to the outcome of the proceeding . . . . Its holding on the immunity issue was thus essential to its judgment . . . ." 288 F.3d at 527. The PUC's present claim is not distinguishable from that holding.

The PUC argues that we erred in our analysis in Amtrak VIII. However, we are

17

bound by our prior decision. 3d Cir. I.O.P. 9.1. The facts of this case do not alter our analysis. The application of collateral estoppel here is equally appropriate because this case, like Amtrak V, involves the assessment of costs against Amtrak for the maintenance of railroad crossings. Therefore, the District Court did not err by holding that the PUC is collaterally estopped from claiming Eleventh Amendment sovereign immunity.

Because we hold that the PUC is collaterally estopped from claiming sovereign immunity in this dispute, it is unnecessary to reach the PUC's alternate arguments challenging the District Court's application of Ex parte Young. As the PUC concedes in its brief, if "the Commission may not even raise its constitutional right to sovereign immunity, then there is no need for an Ex parte Young analysis." PUC's Br. at 24; see also Wheeling & Lake Erie Ry. Co. v. Pa. PUC, 141 F.3d 88, 94 n.9 (3d Cir. 1998) (stating that because the court decided that the PUC was not immune under the Eleventh Amendment due to congressional abrogation, the court did not need to reach the issue of whether Ex parte Young applied).

## 2. Amtrak's Complaint Against Commissioner Wilson

The PUC next contends that the District Court erred by not dismissing Amtrak's complaint against Commissioner Wilson in his individual capacity. The PUC argues that Commissioner Wilson recused himself from participation in the PUC proceedings in this case, and therefore his action, or inaction, did not harm Amtrak. Consequently, the PUC argues that Amtrak does not have standing to bring a claim against Commissioner

18

Wilson.  Our review of standing issues is plenary.  <u>AT&T Communications of N.J., Inc. v. Verizon N.J., Inc.</u>, 270 F.3d 162, 168 (3d Cir. 2001).

The District Court rejected the PUC's argument and held that Amtrak has standing to bring a claim against the PUC and all of its Commissioners.  It stated that the "PUC's position [is] an unnecessarily narrow application of standing doctrine." <u>SEPTA</u>, 210 F. Supp. 2d at 721.  Even applying the stringent test for standing urged by the PUC, we agree with the District Court that Amtrak has standing to sue Commissioner Wilson.

To meet the constitutional requirements for standing, Amtrak must show (1) it suffered an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) that it is likely that the injury will be redressed by a favorable decision.  <u>AT&T Communications</u>, 270 F.3d at 170.  The PUC does not dispute that Amtrak satisfied requirements (1) or (3); rather, it argues that there is not a causal connection between Commissioner Wilson's recusal and Amtrak's injury.

The PUC's argument misses the point.  As Amtrak notes in its brief, its suit against Wilson and the other Commissioners seeks prospective relief against the PUC and its members to prevent future attempts to assess highway bridge maintenance responsibility on Amtrak in violation of the RSPA.  In order to have effective relief, and prevent a repetition of the assessments, the court must have the ability to enjoin the PUC Commissioners individually from assessing costs to Amtrak.  The PUC fails to provide any jurisprudential support for its argument that we should distinguish between those

19

Commissioners who participated and those who did not participate in the past actions. See Verizon Md. Inc. v. Public Service Comm'n of Md., 535 U.S. 635, 645 (2002) (allowing Verizon to proceed in an Ex parte Young action against all commissioners in their official capacities despite the fact that two of five commissioners voted in favor of Verizon's position). Such a rule would unnecessarily hamper the courts' ability to ensure effective prospective injunctive relief and we reject the restriction.

## 3. Full Faith and Credit

We consider next the PUC's assertion that the District Court erred as a matter of law by failing to give the Commonwealth Court's order dated September 7, 2001 full faith and credit.[10] The Full Faith and Credit Act requires federal courts to give state judicial proceedings "the same full faith and credit . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738. As the Supreme Court stated in Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518 (1986), a federal court generally must give deference to a state court judgment, granting "the same preclusive effect to a state-court judgment as another court of that State would give." Id. at 523. The PUC contends that it is subject to conflicting state and federal orders and cannot fulfill its statutory duties because the District Court failed to give proper preclusive effect to the Commonwealth Court's order. We exercise plenary review over

---

[10]The PUC seems to conflate its argument on full faith and credit with its argument based on the Rooker-Feldman doctrine. However, the doctrines are distinct, and we will analyze them separately in turn.

the District Court's legal conclusions. Shire US Inc. v. Barr Labs., Inc., 329 F.3d 348, 352 (3d Cir. 2003).

We consider first the statutory and judicial background that were before the Commonwealth Court at the time it entered the order at issue. The RPSA is a federal statute that grants the federal district courts original jurisdiction over civil actions to enforce Amtrak's exemption and expressly gives those courts the power to grant equitable and declaratory relief.[11] Congress expanded the scope of Amtrak's exemption in 1997 to cover, inter alia, other charges imposed by a State or local entity. See supra n.2. It is evident that Congress was relying on the federal courts to carry out its policy to protect Amtrak from state charges that could seriously interfere with Amtrak's viability.

Moreover, the Commonwealth Court was aware that it was not ruling on a clean slate, as there was ample federal precedent regarding Amtrak's exemption from similar charges, including a holding by this court that the exemption covers the PUC's assessment of railroad crossing maintenance costs. See Amtrak II, 848 F.2d at 440 ("[W]e hold that Amtrak's immunity from local 'taxes or other fees' in section 546b extends to assessments for local improvements. . ." to reconstruct and maintain a bridge crossing over Amtrak's rails); Amtrak III, 1991 WL 998 at *3 ("The Commission's order imposing costs on Amtrak for maintaining the bridge, therefore, violates the exemption

---

[11]That section provides, "The district courts of the United States have original jurisdiction over a civil action Amtrak brings to enforce [its tax exemption] and may grant equitable or declaratory relief requested by Amtrak." 49 U.S.C. § 24301(*l*)(2).

21

statute, Title 45 U.S.C. 546b."). Congress' policy decision to exempt Amtrak from state and local taxes and fees was confirmed by the federal judgments and orders on this issue which predated the Commonwealth Court's order.

The PUC relies on the Supreme Court's decision in Parsons Steel to support its full faith and credit argument. In that case, Parsons Steel sued a bank concurrently in state and federal court. 474 U.S. at 520. In the federal action, which was tried first, the district court granted a judgment n.o.v. to the bank. Id. The bank then pled in the state action the defenses of res judicata and collateral estoppel based on the federal judgment. Id. The state court rejected the bank's res judicata defense, and a jury returned a verdict for Parsons Steel against the bank. Id. Rather than pursuing an appeal in state court, the bank filed for injunctive relief against Parsons Steel in federal court based on the prior federal judgment. Id. at 520-21. The district court held "that the state claims should have been raised in the federal action . . . and accordingly that the [federal] judgment barred the state claims under res judicata." Id. at 521. The district court enjoined Parsons Steel from further prosecuting the state action. Id. The case ultimately reached the Supreme Court.

The Supreme Court recognized that the case raised a potential conflict between the Anti-Injunction Act ("AIA") and the Full Faith and Credit Act. The AIA generally prohibits a federal court from enjoining a state judicial proceeding. 28 U.S.C. § 2283. However, it contains a "relitigation exception" which allows a federal court to grant an

injunction restricting state proceedings "where necessary . . . to protect or effectuate its judgments." 28 U.S.C. § 2283.[12]  The Court stated that federal courts also must adhere to the Full Faith and Credit Act by giving the "same preclusive effect to a state-court judgment as another court of that State would give."  Parsons Steel, 474 U.S. at 523.  The Supreme Court avoided any conflict between the two federal statutes by "limiting the relitigation exception of the Anti-Injunction Act to those situations in which the state court has not yet ruled on the merits of the res judicata issue."  Id. at 524.  In Parsons Steel, the bank raised and the state court rejected the defense of res judicata.  Consequently, the Supreme Court remanded so that the federal court could apply the state's preclusion law.  Id. at 525-26.

The present case is distinguishable from Parsons Steel.  Here, Amtrak was not even a party in the Commonwealth Court proceeding, so there was no state court rejection of Amtrak's claim of entitlement to the statutory exemption.  Under Pennsylvania law, res judicata only binds the parties that participated in the prior litigation.  See Greater N. Am.

---

[12]The relevant statutory provision states:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283.

23

Funding Corp. v. Tara Enters., Inc., 814 A.2d 258, 261 (Pa. Super. Ct. 2002) ("[A] final judgment on the merits by a court of competent jurisdiction will prevent any relitigation of issues that involve the same parties and the same cause of action"); Witkowski v. Welch, 173 F.3d 192, 199 (3d Cir. 1999) (Pennsylvania preclusion law requires that the party against whom preclusion is sought must have been party to the prior adjudication). In the absence of adversarial proceedings in the state court, we have no basis to assume that Amtrak's arguments for application of the federal statutory tax exemption, as construed by the federal courts, were fully developed and argued.

The PUC argues that Amtrak chose not to intervene in the state proceeding and must suffer the consequences of that choice. However, as the District Court points out, in reference to SEPTA, a party is "under no legal duty to appear in state court to preserve a federal judgment in its favor." SEPTA, 210 F. Supp. 2d at 711; see Marks v. Stinson, 19 F.3d 873, 885-86 n.11 (3d Cir. 1994) (In our discussion of the Rooker-Feldman doctrine, we noted that "[a] non-party is not precluded from relitigating matters decided in a prior action simply because it passed by an opportunity to intervene.") (citation omitted). It follows that the PUC cannot use the state court proceedings as a conclusive disposition of Amtrak's claims when it was not a party to those state proceedings.

Unlike Parsons Steel, where the federal court's principal interest was enforcement of its prior final judgment, here Congress gave the district courts jurisdiction for the specific purpose of enforcing the statutory exemption. As we noted in Instructional

24

Systems, Inc. v. Computer Curriculum Corp., 35 F.3d 813, 821 n.14 (3d Cir. 1994), Parsons Steel "did not hold . . . that a state court's consideration of an issue precludes a federal court from doing so." Therefore, Amtrak is not bound by the Commonwealth Court's proceedings and may litigate its claims in federal court.

## 4. Rooker-Feldman

The PUC also attempts to use the Rooker-Feldman doctrine as support for its position. That doctrine bars federal district courts from exercising appellate jurisdiction over state court actions. Rooker v. Fidelity Trust Co., 263 U.S. 413, 416 (1923). The Supreme Court has held that "a United States District Court has no authority to review final judgments of a state court in judicial proceedings. Review of such judgments may be had only in [the Supreme Court]." D.C. Court of Appeals v. Feldman, 460 U.S. 462, 482 (1983). The PUC contends that the District Court's order enjoining assessment of costs to Amtrak and the further prosecution of the Commonwealth Court order was an exercise of appellate review and a reversal of the state court's disposition.

The PUC's Rooker-Feldman argument fails for the same reason that its full faith and credit doctrine claim fails, i.e., that Amtrak was not a party to the state proceedings. Unlike in Rooker and Feldman, here the party bringing the federal action was not a party to the conflicting state action. A state court order to which it was not a party cannot be the basis to deny Amtrak its statutory right to a federal forum to consider the validity of the PUC's order assessing it costs precluded by a federal statute. This court has expressly

25

held that "Rooker-Feldman [does] not bar the district court from hearing the claims of the [] plaintiffs because they were not parties to any of the state court proceedings on the matter." Marks, 19 F.3d at 886 n.11; see also Valenti v. Mitchell, 962 F.2d 288, 297 (3d Cir. 1992) ("[T]he Rooker-Feldman doctrine has a close affinity to the principles embodied in the legal concepts of claim and issue preclusion . . . . that non-parties to a prior action are not bound.").[13]

The PUC argues that although Amtrak was not a party to the state judicial proceedings, Rooker-Feldman still applies because Amtrak was a party to the PUC's administrative proceedings. The Supreme Court has made clear, however, that the Rooker-Feldman doctrine only applies to state judicial proceedings, not administrative or legislative proceedings. See Feldman, 460 U.S. at 476 ("A crucial question in this case, therefore, is whether the proceedings...were judicial in nature."); Verizon Md., Inc., 535 U.S. at 644 n.3 ("The [Rooker-Feldman] doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency."). Although PUC proceedings may have some of the indicia of court proceedings, the PUC is not a court of record and it is therefore not entitled to the application of Rooker-Feldman.

---

[13]We note further that the initial federal ruling on this issue in Amtrak II preceded the state court ruling and therefore the District Court did not exercise jurisdiction over claims that were actually litigated or inextricably intertwined with adjudication by the state's courts. See Desi's Pizza, Inc. v. City of Wilkes-Barre, 321 F.3d 411, 417-18 (3d Cir. 2003).

26

## 5. Injunctive Relief

In its order granting Amtrak relief, the District Court conducted a traditional analysis of whether Amtrak was entitled to preliminary injunctive relief. Although Amtrak had sought both an injunction and a declaratory judgment, the District Court considered only the former. See SEPTA, 210 F. Supp. 2d at 722 (District Court found it "must treat [Amtrak's Motion for Declaratory and Injunctive Relief] as one for preliminary injunctive relief."). We will nonetheless consider whether the District Court's order fails to meet the requirements of relief under the DJA as the PUC argues.

The District Court's order preliminarily enjoined the PUC from assessing costs against Amtrak with respect to the Lloyd Street Bridge and preliminarily enjoined Chester, Delaware County, Norfolk Southern, and PennDOT "from seeking to enforce any PUC order assessing costs to Amtrak with respect to the Lloyd Street bridge." Id. at 728. The PUC argues that because the District Court's order does not enjoin the Commonwealth Court, the order is ineffective as it will not bar the Commonwealth Court from enforcing its current order.

We review a district court's grant of relief under the DJA for abuse of discretion, giving the DJA "a liberal interpretation." United States v. Pa. Dept. of Envtl. Res., 923 F.2d 1071, 1073 (3d Cir. 1991) (citation omitted). Courts consider five factors when reviewing a district court's exercise of jurisdiction under the DJA: (1) the existence of a state court proceeding involving the same issues and parties; (2) the likelihood that the

27

declaration will resolve the uncertainty of the obligation which gave rise to the controversy; (3) the convenience of the parties; (4) the public interest in a settlement of the uncertainty of obligation; and (5) the availability and relative convenience of other remedies. Id. at 1075.

The PUC argues that these factors counsel against the District Court's grant of relief under the DJA. Because the PUC concedes that factor 3 (convenience of the parties) "plays no role in this matter," PUC's Br. at 30, we consider only the other four factors.

First, the PUC argues that the issue of Amtrak's tax exemption has already been fully litigated in a state court proceeding involving the same issues and parties. As discussed above, that contention is incorrect because Amtrak was not a party before the state court. Consequently, the resolution of the issue in state court did not involve the same parties as were involved in the federal proceeding. See Pa. Dept. of Envtl. Res., 923 F.2d at 1075 ("[T]he mere existence of a related state court proceeding does not end the inquiry, rather the question of the adequacy of that state court proceeding remains.").

Second, the PUC argues that the District Court's order did not resolve any uncertainty "since there was already a resolution in the state court." PUC's Br. at 30. This ignores the earlier federal courts' resolutions and the inconsistency between the state and federal dispositions concerning Amtrak's entitlement to tax exemption. As the state court resolution of the issue was not binding on Amtrak, even if that resolution

28

eliminated any uncertainty for the other parties which appealed the PUC's original order, it did not resolve any uncertainty for Amtrak. When the federal proceedings before us were initiated, the question of whether Amtrak's statutory exemption from state and local taxes and fees covered the PUC's assessments was uncertain, albeit only because the Commonwealth Court failed to give the federal courts' decisions effect.

Third (factor 4), the PUC contends that the District Court's order went against the public interest because it prevented the PUC from assessing costs for maintenance of the Lloyd Street Bridge. It argues that because of the conflicting state and federal orders, it is paralyzed from performing its duties and ensuring public safety. To the contrary, nothing in the District Court's order prevents the PUC from performing its duties. It is free to assess costs for the Lloyd Street Bridge upon the other parties, as it did before the Commonwealth Court vacated its order. In addition, as Amtrak points out, the federal proceedings and injunction against future state court actions by the other parties promotes the goals of reducing duplicative litigation and ensuring a uniform interpretation of a federal statute.

Finally, the PUC argues that the most convenient remedy available to Amtrak was for Amtrak to intervene in the Commonwealth Court proceedings, with an opportunity to appeal to the Pennsylvania Supreme Court and the United States Supreme Court. Amtrak was not required to intervene in the state proceedings. Due to its absence as a party, Amtrak could not appeal the Commonwealth Court's order in state court. The District

29

Court has original jurisdiction to enforce the RSPA and the federal courts were a proper forum.

It follows from the above that the District Court's order satisfies the prerequisites of the Declaratory Judgment Act.

## C.

### SEPTA Litigation

The PUC's arguments regarding the SEPTA action overlap with its contentions in its appeal of the Amtrak action. Specifically, the PUC argues that the District Court's order fails to give proper deference to the Commonwealth Court's order under the Full Faith and Credit Act and the Rooker-Feldman doctrine. In addition, the PUC contends that the District Court failed to provide effective injunctive relief.

Our analysis of the PUC's full faith and credit and Rooker-Feldman[14] arguments mirrors our resolution of the same issues in the Amtrak action. SEPTA was not a party to the state court proceedings, and therefore, the District Court was not limited, under either the Full Faith and Credit Act or the Rooker-Feldman doctrine, by the Commonwealth Court's order. In fact, due to the SEPTA-PUC federal Consent Decree, the PUC's full

---

[14]SEPTA argues that the PUC failed to adequately brief the Rooker-Feldman issue and consequently waived that claim. See Reynolds v. Wagner, 128 F.3d 166, 178 (3d Cir. 1997) (holding that a single conclusory statement in a brief without more results in waiver of the argument). The PUC introduces its Full Faith and Credit Act analysis with a reference to the Rooker-Feldman doctrine. However, it does not provide any significant analysis of the doctrine in its brief. Although we agree that the PUC's analysis is lacking, we will decide the issue on the merits.

faith and credit argument is even less persuasive in the context of the SEPTA action.

SEPTA did not seek appellate review in federal court of the Commonwealth Court's order but merely sought enforcement of the Consent Decree. SEPTA entered the Consent Decree with the PUC in federal court prohibiting the PUC from assessing costs against SEPTA. In Delaware Valley Citizens' Council v. Pennsylvania, we held that a state court cannot grant an order nullifying a federal consent decree. 755 F.2d 38, 44-45 (3d Cir. 1985). The state court order in that case nullified a federal consent decree previously entered into by the parties and enjoined the parties from respecting its terms. Id. at 41. The party that prevailed in the state court then brought suit in federal district court to vacate the consent decree. Id. We affirmed the district court's refusal to modify the consent decree. As we stated, "[o]nly federal courts have the power to determine the authority of federal court litigants, bringing suit under federal law, to enter into consent decrees approved by a federal court." Id. at 44. Consequently, a federal district court has authority to enforce its consent decrees, even if such enforcement is in conflict with a state court order. See id. at 45 (It is "settled law that a final federal court judgment based on federal law cannot be collaterally attacked by a state court. . .").

Here, the Commonwealth Court simply ignored the binding nature of the Consent Decree because none of the parties to the underlying PUC proceedings (the entities who were assessed a portion of the costs) were parties to the Consent Decree proceedings.[15]

---

[15]The Commonwealth Court clearly overlooked the fact that SEPTA was a party to both the PUC proceedings and the Consent Decree proceedings.

City of Chester, 773 A.2d at 1286. However, the District Court was not bound by the Commonwealth Court's holding regarding the Consent Decree. As the Supreme Court has instructed, "where the judgment or decree of the federal court determines a right under a federal statute, that decision is 'final until reversed in an appellate court, or modified or set aside in the court of its rendition.'" Stoll v. Gottlieb, 305 U.S. 165, 170 (1938) (citation omitted). Just as in Delaware Valley, the District Court properly exercised its authority to enforce the provisions of the Consent Decree which bar the PUC from assessing maintenance costs against SEPTA. In light of the history preceding this litigation, we are impelled to note that further efforts to bring suit challenging the Consent Decree in state court may well violate counsel's ethical duty not to bring frivolous lawsuits.

Finally, the PUC also argues here that the District Court's injunctive relief is ineffective, repeating the argument it makes in the Amtrak case. We reject the argument for the same reasons we set forth there.

### III.

### CONCLUSION

For the above stated reasons, we will affirm the District Court's order.